Cynthia WASSON and Kenneth Wasson, Respondents,

v.

SHELTER MUTUAL INSURANCE COMPANY, Appellant.

No. WD 72991.

Missouri Court of Appeals, Western District.

Nov. 8, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 20, 2011.

Application for Transfer Denied March 6, 2012.

William Clayton Crawford and James Patrick Maloney, Kansas City, MO, for appellant.

Laurie Schear Ward, Sedalia, MO, for respondents.

Before Division Two: JAMES M. SMART, JR., P.J., MARK D. PFEIFFER and CYNTHIA L. MARTIN, JJ.

JAMES M. SMART, JR., Judge.

Shelter Mutual Insurance Company appeals a declaratory judgment in favor of its insureds, Cynthia and Kenneth Wasson. Shelter contends that the court erred in finding certain provisions of its insurance policy ambiguous and in ruling in the Wassons' favor on that basis. The judgment is reversed in part and affirmed in part.

### Background

On May 14, 2008, Cynthia Wasson was seriously injured when her motor vehicle was struck by another driver. At the time of the accident, Cynthia and Kenneth Wasson were insured under an automobile insurance policy issued by Shelter. That

policy included an endorsement for underinsured motorist (UIM) coverage.[1]

The driver who struck Cynthia was insured by State Farm Mutual Insurance. Following the accident, State Farm paid the Wassons $100,000 on behalf of its insured, which exhausted the liability coverage provided by that policy. This was insufficient to compensate the Wassons for the total amount of their monetary damages, which exceeded $600,000.

After receiving payment from State Farm, the Wassons made a claim for UIM coverage under their policy with Shelter. Shelter paid the Wassons $150,000 for UIM coverage, claiming that to be the policy limits after the policy's "set-off" provision is applied. Shelter arrived at the figure of $150,000 by starting with the amount Shelter contends was the declared policy limit for UIM coverage, $250,000, and off setting that by the $100,000 that State Farm paid the Wassons.

The Wassons filed a petition for declaratory judgment in which they claimed that a total of $500,000 was available for UIM coverage under the policy. The petition set forth policy provisions and alleged that the parties "disagree on the interpretation of the insurance policy contract entered into between [them] as to the amount of coverage available to Plaintiffs under their underinsured motorist coverage." The Wassons sought a declaration that Shelter owed them an additional $350,000 for UIM coverage. Shelter denied that any additional UIM benefits were available under the policy.

At a bench trial in July 2010, the parties presented their stipulations to the court and Cynthia Wasson testified briefly. The parties stipulated that Ms. Wasson had suffered serious injuries in the accident on May 14, 2008, and that her total economic damages exceeded $600,000. The sole question with regard to the Wassons' UIM claim was the amount of coverage that was applicable to those damages.

The Wassons argued that the policy is ambiguous with respect to the declared limit of liability for UIM coverage, such that the UIM limit stated in the Declarations would be $500,000. They also claimed that the "set-off" provision in the policy is ambiguous and that the UIM policy limits should not be reduced by the $100,000 paid by State Farm. In sum, the Wassons interpret the contract as subtracting the amount paid by State Farm ($100,000) from the total damages (over $600,000), leaving Shelter to pay the uncompensated damages up to the policy limits (which the Wassons believe to be $500,000). Shelter interprets the contract as starting with UIM coverage limits of $250,000 and reducing that amount by State Farm's $100,000 payment, leaving Shelter owing the reduced policy limit of $150,000. This is a summary of the parties' positions:

| Wassons' Position | | Shelter's Position |
|---|---|---|
| $500,000 | Declared UIM Limit | $250,000 |
| –0– | Set–off Amount | –100,000 |
| –150,000 | UIM Coverage Paid | –150,000 |
| $350,000 | UIM Coverage Not Paid | $–0– |

The trial court ruled in favor of the Wassons on the two issues relevant to

1. At the time of the accident, the Wassons were insured by three additional insurance policies issued by Shelter. None of those policies included UIM coverage, however.

UIM coverage, *i.e.*, the declared limit of liability and the "set-off" provision.[2] The court found the UIM endorsement to be ambiguous when read in conjunction with the Declarations page of the policy. Construing this ambiguity in favor of the insureds, the court declared that the Wassons were entitled to $500,000 in UIM coverage. With regard to the "set-off" issue, the court found that prior case law required it to reject Shelter's claim that it is entitled to offset its policy limits by the $100,000 paid by State Farm. In light of Shelter's prior payment of $150,000, the court declared that "there remains $350,000 due and owing under the underinsured provisions of the contract." Shelter appeals.

## Point on Appeal

Shelter says the trial court erred in declaring that the Wassons are entitled to a total of $500,000 in UIM coverage based on its finding that provisions of the Shelter policy were ambiguous. Shelter claims that (1) the limit of liability for UIM coverage is clearly and unambiguously stated in the Declarations as $250,000 per person, and (2) the policy clearly and unambiguously provides for a reduction, or "set-off," of the UIM coverage limit by the amount State Farm paid on behalf of the tortfeasor. According to Shelter, no additional UIM coverage is available beyond the combined $250,000 that the Wassons have already received from State Farm and Shelter. Thus, the issues to be decided in this appeal are whether the declared limit for UIM coverage under the policy is

$250,000 or $500,000, and whether the amount paid by Shelter must be reduced by the $100,000 paid to the Wassons by the other driver's insurance.

### Standard of Review

█ The parties agree that the determinative issue is whether specific provisions of the insurance policy are ambiguous. "The interpretation of an insurance policy, and the determination [of] whether coverage and exclusion provisions are ambiguous, are questions of law that this [c]ourt reviews *de novo*." *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). In construing the terms of an insurance policy, we apply the meaning that would be attached by an ordinary person of average understanding if purchasing insurance, and we resolve ambiguities in favor of the insured.[3] *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007). "Language is ambiguous if it is reasonably open to different constructions." *Id.*

### Issue I: UIM Coverage Liability Limits

█ We turn first to Shelter's argument concerning the limits of liability for UIM coverage. The purpose of underinsured motorist coverage is to provide insurance coverage for insureds who have been bodily injured by a negligent motorist whose own automobile liability insurance coverage is insufficient to pay for the injured person's actual damages. *See Long v. Shelter Ins. Co.*, 351 S.W.3d 692, 695 (Mo.App. W.D., 2011). "UIM cover-

---

**2.** The trial court rejected other claims the Wassons had raised with regard to stacking medical payments coverage under their Shelter policies. That issue is not being appealed.

**3.** "This rule, often referred to as the doctrine of *contra proferentem*, is applied more rigorously in insurance contracts than in other contracts in Missouri." *Burns*, 303 S.W.3d at

509–10. Ambiguous language is construed against the insurance company, because (1) insurance is intended to furnish protection, not defeat it, and (2) the company, as the drafter of the policy, is in the best position to remove any potential ambiguity. *See id.* at 511; *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210–11 (Mo. banc 1992).

age is floating, personal accident insurance that follows the insured individual wherever he goes rather than insurance on a particular vehicle." *Id.* In Missouri, there are no statutory requirements for underinsured motorist coverage. *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208, 210–11 (Mo. banc 1992). Thus, it is the contract of insurance that defines and limits such coverage. *Id.*

■ To resolve this issue, we look to the policy's declarations, endorsements, and amendments pertaining to UIM coverage. *See Long,* 351 S.W.3d at 701 ("To determine whether an insurance policy provides coverage, we look to the insurance contract itself."). Ordinarily, one begins with the declarations page and the coverage declarations there. In this case, we see that "Coverage A" of "Part I" of the policy is "Bodily Injury Liability Coverage." "Coverage B" is Property Damage, "Coverage C" is Medical Payments Coverage, "Coverage D" is Accidental Death, "Coverage E" is Uninsured Motorists Coverage (not *under* insured), "Coverage F" is Collision, "Coverage G" is Comprehensive, and "Coverage J" is Emergency Road Service.

Underinsured Motorist coverage is *not* one of the coverages that Shelter lists as a standard item on the declaration sheet, but arises from an endorsement that, along with five other endorsements, has been added to the policy; it is shown, along with the other endorsements, as an endorsement (with the limits of liability of $250,000 and $500,000 specified) on the

Declarations page, all of which are declared to be "a part of this policy."

■ The Declarations page refers to the endorsement as "*A–577.6–A Underinsured Motorists $250,000 Per Person/$500,000 Per Accident.*" As in the case of the other endorsements, UIM coverage is implemented within the policy *purely* by the specific UIM endorsement. If there is no specific UIM endorsement, there is no underinsured motorist protection and no provision at all related thereto. There are only two places to find anything about Wassons' UIM coverage—the Declarations page, and the endorsement pages.

One of the endorsements (other than the UIM endorsement) changes the limits on one of the standard coverages: bodily injury liability. The reader is referred to endorsement A–547.6–A. That endorsement (which was added as an amendment to the policy sometime prior to the accident)[4] changes the bodily injury liability limit to a "single limit of liability" of $500,000 for bodily injury (meaning that there is no per person/per accident distinction). It is relatively clear to the average reader that whatever may have been the initial and former limits of Coverage A (bodily injury liability), it has now been changed to a single $500,000 limit by the endorsement. It is also relatively clear that the endorsement changing the limits of liability relates only to Coverage A and not to any other coverage, absent the *specific adoption* of the coverage limits of Coverage A. The

---

4. That amendment changed the policy limits for "Coverage A" from $250,000 Per Person, $500,000 Per Accident to a "Single Limit of Liability" in the amount of $500,000. The Wassons say that this amendment added to the ambiguity, in that prior to the amendment, Shelter used the same designation for Coverage A and for UIM coverage: $250,000 Per Person, $500,000 Per Accident. The Wassons contend that Shelter's amendment to Coverage A "was implemented without regard to the impact on the UIM coverage, such that once the amendment was in place, Coverage A and UIM coverage no longer used the same designation for coverage." They say that "because Shelter failed to amend, clarify, or distinguish the language in the UIM endorsement, the contract became uncertain as to what coverage and what terms applied to UIM coverage."

Wassons argue here that there was such a *specific adoption* in this case.

The Wassons argued at trial that the stated liability limit for UIM coverage was the limit applicable to Coverage A, *i.e.,* the $500,000 single limit of liability. The Wassons based this argument on their interpretation of a table that is located immediately beneath the title on the UIM endorsement page. This table, without any introductory remarks, appears as follows:

| Endorsement Number | Limits of Liability |
| --- | --- |
| A–577.5–A | Same as Coverage A Limits |
| A–577.6–A | $_Per Person, $_Per Accident |

(This Coverage applies only when the endorsement number and limits of liability are stated in the Declarations.)

Upon reading this table, on its face, it would appear to mean that the limit of liability for UIM coverage depends on the number of the applicable endorsement. The limit is either the same as Coverage A (single limit of $500,000), or it is broken into a particular (but here unspecified) amount per person, and a particular (but here unspecified) amount per accident. If the applicable endorsement is A–577.5–A, the coverage limit is the same as that of the bodily injury liability coverage. If the applicable endorsement is A–577.6–A, the blanks appearing under the heading "limits of liability" could either indicate that there is no coverage provided (which would be highly confusing in light of the Declarations page, which shows $250,000/$500,000) or it could indicate that one must refer elsewhere, to wit: to the Declarations page, to find the coverage limit applicable to claims per person and per accident.

The Wassons claimed that the UIM endorsement is ambiguous and that the table could be interpreted to mean that the limit of liability for UIM coverage is the same as the limit for Coverage A ($500,000).

Because ambiguities must be construed in favor of the insureds, the Wassons claimed they thus were entitled to $500,000 UIM coverage.

In ruling in favor of the Wassons' argument, the trial court noted that the policy says Shelter "will pay the uncompensated damages, subject to the limit of our liability stated in this coverage" and that "[t]he limit of . . . coverage is stated in the endorsement, declaration and amendment." The trial court believed that the table created an ambiguity, not because of the blanks, but because:

A careful reading of the endorsement can be interpreted in two different ways. The endorsement number A–577.6–A could be argued to be "Same as Coverage A Limits" or it could be read as "$_ per person, $_ per accident." In looking at the Declaration page, the coverage limits are different. One is specified as "$250,000 per person/$500,000" [sic] and the other references Coverage A limits for bodily injury and is amended by separate endorsement to $500,000.

Thus, the court found that the right side of the table *could* be read independently of the endorsement numbers on the left as showing the following:

Limits of Liability

Same as Coverage A Limits

$_ Per Person, $_ Per Accident

Or, the court believed, the entire table could be read as expressing the limits pertinent to the respective endorsement numbers:

| Endorsement Number | Limits of Liability |
| --- | --- |
| A–577.5–A | Same as Coverage A Limits |
| A–577.6–A | $_Per Person, $_ Per Accident |

The court concluded that

[a]rguments for both sides on the limits of coverage are plausible. While

the contract language itself is not ambiguous, the Underinsured Motorist Endorsement when read with the Declaration page and the Amendment to Coverage creates an ambiguity because they can be plausibly read two different ways. The [c]ourt construes the ambiguity in favor of the insured.

Shelter, on appeal, says that the court's finding of an ambiguity depended upon the court's belief that it was equally valid to read the table's columns and rows vertically and horizontally, so that, if one reads it vertically (and ignores the left side of the table) the phrase "same as Coverage A limits" means the limit of liability for UIM coverage is the same as that for Coverage A. Shelter says this interpretation disregards the manner in which an ordinary person would read such a table (*i.e.*, from left to right) and also "completely ignores" the parenthetical statement that the coverage applies only to the endorsement number and limits of liability stated in the declarations. Shelter notes that the Declarations page states that UIM coverage is provided under endorsement number A–577.6–A, with limits of $250,000 per person, $500,000 per accident. Shelter also points out that the UIM endorsement includes a provision titled "LIMITS OF OUR LIABILITY," which states:

> The limits of liability for this coverage are stated in the Declarations and are subject to the following limitations:....

Thus, according to Shelter, the policy clearly and unequivocally states that the limit of liability for UIM coverage is $250,000 per person, as indicated in the Declarations page, subject to certain limitations, as stated in the UIM endorsement. Shelter says the trial court's ruling is inconsistent with the plain language of the policy.

As noted, the question of whether an insurance policy is ambiguous is a question of law subject to *de novo* review. *Seeck,* 212 S.W.3d at 132. "*De novo* review in this case requires the application of well-settled principles of contractual interpretation[.]" *Gavan v. Bituminous Cas. Corp.,* 242 S.W.3d 718, 720 (Mo. banc 2008). "If the language in an insurance contract is clear and unambiguous, this [c]ourt must construe the contract as written." *Id.* "Absent an ambiguity, an insurance policy must be enforced according to its terms." *Seeck,* 212 S.W.3d at 132. The policy "must be given effect according to the plain terms of the agreement, consonant with the reasonable expectations, objectives and the intent of the parties." *Long,* 351 S.W.3d at 701. "We look to definitions in insurance policies to guide our interpretation, but when words or phrases are not defined in the policy, we look to the plain meaning of words and phrases as it would have been understood by an ordinary person of average understanding when buying the policy." *Id.* (citing *Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687, 690 (Mo. banc 2009)).

Recently, this court examined a Shelter policy that contained the same provisions that are at issue here. *See Long,* 351 S.W.3d at 701–02 . In examining the declarations page and the UIM endorsement there, we explained that the UIM endorsement clearly indicates to the reader that the insured has the right to receive "uncompensated damages," as defined in the UIM endorsement, "subject to the limit of [Shelter's] liability *stated in this coverage.*" *Id.* at 702. In seeking to determine what the phrase "subject to the limit of [Shelter's] liability *stated in this coverage*" meant, we stated:

> If the ordinary insured looks at the top right corner of the endorsement, it states "Limits of Liability." Beneath that reference there are no numbers and the "per person/per accident" amounts

are left blank. Immediately below this, however, the ordinary insured will see that the endorsement states: "(This Coverage applies only when the endorsement number and limits of liability are stated in the **Declarations**.)" The ordinary insured will thus know that the limits of liability will be stated in the "Declarations." Once again, the ordinary insured will observe that the word "Declarations" is in bold, and is thus a defined term. The definition of "Declarations" (which notably does *not* appear in the UIM endorsement, but instead, in the general terms of the Shelter policy) provides, in pertinent part, that the Declarations "set [ ] out many of the individual facts related to your policy including ... *amounts of various coverages.*"

*Id.* (emphasis added). We explained that "based on this definition of 'Declarations,' the ordinary insured turns to the Declarations page," and that the declarations page "tells the ordinary insured the UIM 'coverage' is [in that case] $100,000 per person/$300,000 per accident." *Id.*

This court in *Long* discussed the identical UIM endorsement page (and table) in dispute here. In the *Long* policy, the limits of liability for Coverage A shown on the declarations page was the same as the amount listed as the limit of liability for UIM coverage on the declarations page. Here, those limits of liability are different. Nevertheless, common sense, consistent with this court's explanation in *Long* as to how the ordinary insured would be expected to interpret the policy provisions, governs our decision here.

▮ Courts are not to interpret the provisions of an insurance policy in isolation but rather are to examine the policy as a whole. *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d at 135; *Seeck*, 212 S.W.3d at 133. In this case, the Declarations page indicates that the endorsement

number pertaining to UIM coverage is A–577.6–A, with limits of $250,000 per person, $500,000 per accident. The endorsement page does nothing to change that perception. "While ambiguity exists if the term is '*reasonably* open to different constructions,' ... an *unreasonable* alternative construction will not render the term ambiguous." *Gavan*, 242 S.W.3d at 720 (quoting *Seeck*, 212 S.W.3d at 132) (emphasis added). Courts will not distort the language of an unambiguous insurance policy in order create an ambiguity where none exists. *Krombach*, 827 S.W.2d at 210. Moreover, seeming contradictions in an insurance policy must be harmonized if reasonably possible. *Haggard Hauling & Rigging Co. v. Stonewall Ins. Co.*, 852 S.W.2d 396, 401 (Mo.App.1993).

Here, the policy's Declarations page, UIM endorsement, and the table at the top of the endorsement page would have been understood by an ordinary person of average understanding to provide limits of liability for UIM coverage of $250,000 per person, $500,000 per accident. The trial court erred in declaring the provision ambiguous and in concluding that the limits of liability for UIM coverage under the policy was $500,000. The applicable limit of liability was $250,000 in accordance with the clear language of the Declarations page.

### Issue II: Set–Off Provision

▮ The second issue pertains to the policy's "set-off" provision. Shelter says the trial court erred in finding that the "set-off" provision is ambiguous.

The trial court ruled that the ambiguity came from the endorsement, titled "MISSOURI UNDERINSURED MOTORIST ENDORSEMENT," which states in part:

INSURING AGREEMENT

If:

(a) an **insured** sustains **bodily injury** as a result of an **accident** involving the **use** of an **underinsured motor vehicle;** and

(b) the **owner** or **operator** of that **underinsured motor vehicle** is legally obligated to pay some or all of the **insured's damages, we** will pay the **uncompensated damages,** subject to the limit of **our** liability stated in this coverage.

. . . .

ADDITIONAL AND REPLACEMENT DEFINITIONS USED THIS ENDORSEMENT

As used in this coverage,

(1) **Damages** means the full amount of money payable to an **insured** for bodily injuries that directly resulted from the **accident** involving the **underinsured motor vehicle.**

. . . .

(3) **Uncompensated damages** means the portion of the **damages** that exceeds the total amount paid or payable to an **insured** by, or on behalf of, all persons legally obligated to pay those **damages.**

(4) **Underinsured motor vehicle** means a **motor vehicle** that is covered by a liability bond or insurance policy applicable to the **accident,** but its available limits are less than the full amount owed by the **owner** or **operator** of that **motor vehicle** for the **insured's damages.**

Taking the foregoing language at face value, it would appear perfectly clear that the purpose of UIM coverage is to provide excess insurance over the insurance provided by a negligent tortfeasor. It would seem that whereas uninsured motorist (UM) coverage is designed to provide basic coverage (up to a limit specified in the policy) where the tortfeasor is uninsured, underinsured motorist (UIM) coverage is designed to provide excess coverage above and beyond the insurance provided by the tortfeasor.

The key to understanding the parties' differences of opinion is that the Wassons view the UIM coverage as excess coverage, while Shelter views its contract as not being excess coverage, in accordance with the 1991 decision in *Rodriguez v. General Accident Insurance Company of America,* 808 S.W.2d 379 (Mo. banc 1991). Shelter emphasizes the policy provision within the paragraph heading entitled "limits of our liability," to wit:

LIMITS OF **OUR** LIABILITY

The limits of liability for this coverage are stated in the **Declarations** and are subject to the following limitations:

. . . .

(4) The limits are reduced by the amount paid, or payable, to the **insured** for **damages** by, or for, any **person** who:

(a) is legally liable for the **bodily injury** to that **insured;** or

(b) may be held legally liable for the **bodily injury** to that **insured.**

Shelter says it owes no more than the $150,000 it has already paid to the Wassons based on this formula: $250,000 (policy limits)-$100,000 (paid by State Farm) = $150,000 (the amount Shelter has already paid).

We have no doubt that this is what was intended *by Shelter* in issuing the policy, but our inquiry does not stop with what Shelter intended, when that intent is not expressed in the policy. The question is what the average person reading the policy would believe. *Seeck,* 212 S.W.3d at 132. One problem with Shelter's argument is that the definition of the term "uncompensated damages" does ***not*** include the fol-

lowing bracketed, italicized and bolded language in the definition:

> Uncompensated damages means the portion of the damages [*up to our limit of liability*] that exceeds the total amount paid or payable to an insured by, or on behalf of, all persons legally obligated to pay those damages.

Shelter would wish that it did include such language, but it does not. The result is that it reads exactly like excess insurance. The difference is illustrated in the hypothetical case as follows: Ms. Insured, who has $50,000 UIM coverage with Shelter, is injured in a collision with Mr. Tortfeasor, who has insurance with Continental Coverage. Continental accepts responsibility and pays the policy limits of Mr. Tortfeasor's coverage ($50,000). Ms. Insured has $250,000 of damages. Ms. Insured, however, is entitled to nothing from Shelter, because, according to Shelter, the UIM coverage is not excess coverage.

The Wassons agree that the policy language gives Shelter credit for the State Farm payment, but only as a deduction from the total actual damages, not as a deduction or set-off from the *policy limits*. This is exactly the holding of *Jones v. Mid–Century Insurance Co.*, 287 S.W.3d 687 (Mo. banc 2009), and *Ritchie v. Allied Property & Casualty Insurance Co.*, 307 S.W.3d 132 (Mo. banc 2009). The deduction thus is from the *total damages* ($600,000), and Shelter receives no deduction from its limit of liability in this case. Shelter's position, despite the language of *Rodriguez* and the cases that have followed *Rodriguez*,[5] is untenable.

*Jones* and *Ritchie*, both decided by the Supreme Court in 2009, govern this issue. In *Jones*, the plaintiffs were injured when their vehicle was struck by a driver insured by American Family with $50,000/$100,000 coverage. 287 S.W.3d at 689. The plaintiffs each suffered more than $150,000 in damages. Each received $50,000 from American Family. The plaintiffs' policy (issued by Mid–Century) provided underinsured motorist coverage in the amount of $100,000/$300,000. Mid–Century claimed it owed each plaintiff only $50,000. The trial court agreed. The Supreme Court reversed that decision, holding that Mid–Century was not entitled in that case to an offset against the limit of liability, but instead was entitled to the offset against the total damages, which meant that the policy limits were still payable. *Id.* at 691.

In *Ritchie*, the parents of a deceased obtained a wrongful death judgment against underinsured tortfeasors, and then sought $300,000 in underinsured motorist benefits under their coverage with the insurer, Allied. 307 S.W.3d at 134–35. The Court in *Ritchie*, following *Jones*, rejected Allied's argument that it was entitled to a setoff for the amounts received from the third parties, because the insureds' damages exceeded the amounts received from the third parties. *Id.* at 140.

Shelter, in discussing *Rodriguez* and other cases, does not analyze and compare the insuring language of the policies in those cases, but instead compares only the limits of liability sections of those policies. Shelter does not deal analytically with *Jones* and *Ritchie*, which are directly contrary to Shelter's argument as to the limits of liability and the set-off language.

Shelter's position also is completely counter-intuitive as to the average policyholder, because the average policyholder is likely to think (by virtue of the very name,

---

5. *See, e.g., Shelter Mut. Ins. Co. v. Straw*, 334 S.W.3d 592 (Mo.App.2011); *Lynch v. Shelter Mut. Ins. Co.*, 325 S.W.3d 531 (Mo.App.2010).

"underinsured motorist coverage," and the definition of "uncompensated damages") that the whole point of UIM coverage is to buy excess insurance over the amount of any compensation received from the tortfeasor's insurer. Shelter has chosen to employ a paragraph entitled "limits of liability" to try to inform the policyowner that this insurance is not excess insurance. The policyholder knows by reference to the declarations page what the limits of liability are. There is no reason at all to be looking for a set-off provision against the limits of liability when the definition of "uncompensated damages" has *already* taken into account the payment made on behalf of the tortfeasor. In fact, as pointed out in *Jones,* 287 S.W.3d at 691–92, the term "limit of liability" is used in an unusual way here. We know that the state law minimum required coverage under the Motor Vehicle Financial Responsibility Law is $25,000. So, a policy of UIM coverage that has a $50,000 liability limit is never going to actually have a limit of liability of $50,000 (under Shelter's theory of the policy). *Id.* at 692. If the tortfeasor has minimum coverage, the actual limit of Shelter's liability is $25,000. If the tortfeasor has $50,000 worth of coverage, the limit of Shelter's liability is zero. *Id.* Despite the fact that *Shelter* intended that the UIM coverage would not be excess coverage, the average reader would not anticipate or understand this intention from a normal reading of the policy.

Shelter is arguing an interpretation that is similar to whether a term of exclusion applies. The courts of Missouri "strictly" construe exclusionary clauses against the drafter, "who also bears the burden of showing that the exclusion applies." *Burns,* 303 S.W.3d at 509–10. In ruling in favor of the Wassons, the trial court explained that language such as that used in the set-off provision in the UIM endorsement of this policy "is by its nature ambiguous." The court observed that "[t]he contract between [the parties] reduces the limits of coverage for underinsured motorist coverage by the amount paid to the plaintiffs by tortfeasors who are legally obligated for the damages." Citing *Rice v. Shelter Mutual Insurance Co.,* 301 S.W.3d 43 (Mo. banc 2009), and *Jones v. Mid–Century Insurance Co.,* 287 S.W.3d 687 (Mo. banc 2009), the trial court explained that the Supreme Court has "held that [a similarly worded] provision allowed for the insurer to subtract the amount of money paid by the tortfeasor 'from the *total damages*' and not from the stated policy limits" (emphasis added), due to the fact that the policy was misleading in that it "grants coverage in one provision and limits it in another." Based on that authority, the court found the policy language limiting the underinsured motorist coverage in this case to be ambiguous and construed it in favor of the insured.

Shelter says this was error because the Wassons' policy meets Missouri's standards for enforceable set-off provisions. Shelter, as we have said, relies on *Rodriguez,* in which the Missouri Supreme Court upheld the use of a UIM set-off provision. Shelter also relies upon *Lynch* and *Straw,*[6] two Southern District cases in which the court agreed with Shelter on this issue. The Wassons point out, however, that the *Lynch* case had different policy language and that the ruling in *Straw* cannot be reconciled with the Supreme Court's reasoning in *Jones* and *Ritchie,* in which the Court found in favor of the insureds on this same issue.

Recently, this court addressed this exact same question as it pertained to a Shelter policy that contained the same language

6. *Straw,* 334 S.W.3d at 592; *Lynch,* 325 S.W.3d at 531.

and provisions that are at issue here. *See Long*, 351 S.W.3d at 701–02. Relying primarily on the Supreme Court precedent in *Jones*, 287 S.W.3d at 687, and *Ritchie*, 307 S.W.3d at 132, the *Long* court concluded that the pertinent policy language was ambiguous and found in favor of the insureds. *Id.* at 705.

■ When an insurance policy unequivocally and unconditionally promises the insured something in one part of the policy, but then unexpectedly contradicts or undermines that promise in another part of the policy, it creates an ambiguity. *See Long*, 351 S.W.3d at 699.

In *Long*, this court analyzed the pertinent policy language and stated:

> The ordinary person of average understanding will realize, upon reading the insuring agreement, that the UIM endorsement affords the insured insurance for uncompensated damages. The ordinary insured will realize that "uncompensated damages" is in bold, and is thus defined. The ordinary insured will read the definition of "uncompensated damages" in the endorsement and will see that it means "damages that exceed the total amount paid or payable to an insured, by or on behalf of, all persons legally obligated to pay those damages." The ordinary insured will read this plain language to mean that the UIM endorsement will pay the insured the excess over and above what the insured receives from others who are liable to the insured.

*Id.* at 702.

The court then noted that although the "ordinary insured" will also see that the right to receive "uncompensated damages" is plainly and clearly "subject to the limit of [Shelter's] liability *stated in this coverage*," they will know that the normal place to look for the limits of liability is the declarations page. *Id.* And the declarations page "tells the ordinary insured that

the UIM 'coverage' is [in that case] $100,000 per person/$300,000 per accident." *Id.* As to the set-off provision in the policy, this court continued:

> The discussion of the ordinary insured's coverage on the Declarations page is not limited by any language suggesting the limits are subject to set-off or reduction. There is thus no reason for the ordinary insured to look any further to form the reasonable belief that the insured has obtained UIM coverage in the maximum amount of $100,000 per person/$300,000 per accident available to cover any excess damages incurred over and above those paid by others liable (in other words, the definition of "uncompensated damages" subject to the insured's reasonable interpretation of the phrase "limit of our liability *stated in this coverage*").

*Id.*

We noted that the definition of "underinsured motor vehicle" in the UIM endorsement "reaffirms to an ordinary insured that the UIM endorsement, and in particular the insuring agreement, provides for 'excess coverage' over and above what is paid by others who are liable up to the limits of the UIM coverage[.]" *Id.* at 703. We then noted that language in the "General Agreements" found in both policies "further confirms that the phrase 'subject to the limits of our liability *stated in this coverage*' as appears in the UIM endorsement insuring agreement MUST mean the coverage amounts shown in the Declarations Page." *Id.*

The *Long* court concluded that because the UIM endorsements in the Shelter policies state that Shelter "will pay the **uncompensated damages** subject to the limit of [Shelter's] liability stated in this coverage," and because "[u]ncompensated damages are defined in each of the Shelter policies as damages exceeding the total amount paid to an insured by a person

legally obligated to pay those damages," Shelter was obligated to pay the amount of "uncompensated damages" that remained after the amount paid on behalf of "a person legally obligated to pay" was applied to the stipulated damages, up to the policy limits of the UIM policy limits in that case. *Id.*

The language relevant to the set-off provision in this case is identical to that in *Long.* We affirm the trial court's decision that the "set-off" provision is at best ambiguous, and affirm its conclusion that the provision means Shelter may deduct the $100,000 from State Farm from the Wassons' total damages, but not from the policy limits for UIM coverage. *See Jones,* 287 S.W.3d at 692.

### Ruling

The trial court's determination that Shelter was not entitled to set off the amount paid on behalf of State Farm's insured tortfeasor ($100,000) is affirmed. We hold that, based on the language of this policy, Shelter was not entitled to apply the set off to the limits of liability, but may apply it only to the "uncompensated damages" of $500,000 ($600,000 damages minus the $100,000 received from the tortfeasor).

As for the UIM limit of liability, we hold that the "limit of liability" was the $250,000 stated on the Declarations page. We reverse that part of the judgment to the contrary. The judgment is accordingly affirmed in part and vacated in part.

The case is remanded to the circuit court to enter a new judgment on behalf of the Wassons in accordance with this opinion.

All concur.