

# Missouri Court of Appeals

## Southern District

## Division Two

OWNERS INSURANCE COMPANY,  )
                                    )
     Plaintiff-Appellant,       )
                                    )
v.                              )     No. SD34053
                                    )
CHRIS and VICKI CRAIG,      )     **Filed: July 19, 2016**
                                    )
     Defendants-Respondents.   )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Jason Brown

### REVERSED AND REMANDED WITH INSTRUCTIONS

Owners Insurance Company ("Owners") appeals a summary judgment entered in favor of its policyholders Vicki Craig and Chris Craig ("Insureds") that denied Owners the right to reduce the amount paid under its Underinsured Motorist ("UIM") coverage by the amount paid by the at-fault driver's liability insurer ("the set-off").[1]  Because the policy at issue ("the Policy") clearly and unambiguously provided for the set-off, we reverse the judgment and direct the trial court to enter judgment in favor of Owners.

### Standard of Review & Applicable Law

The interpretation of an insurance policy is a question of law we review *de novo*. *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007).

---

[1] Each party filed a motion for summary judgment based on stipulated facts.  The trial court denied Owners' motion and granted the competing motion filed by Insureds.

"In construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured." *Seeck*[, 212 S.W.3d at 132]. "Language is ambiguous if it is reasonably open to different constructions." *Id.*

. . . .

"The purpose of underinsured motorist coverage is to provide insurance coverage for insureds who have been bodily injured by a negligent motorist whose own automobile liability insurance coverage is insufficient to pay for the insured person's actual damages." *Wasson v. Shelter Mut. Ins. Co.,* 358 S.W.3d 113, 117 (Mo. App. W.D. 2011). "To determine whether an insurance policy provides coverage, we look to the insurance contract itself." *Long*[ *v. Shelter Ins. Cos.*]*,* 351 S.W.3d [692,] 701 [(Mo. App. W.D. 2011)]. "Courts are not to interpret the provisions of an insurance policy in isolation but rather are to examine the policy as a whole." *Wasson,* 358 S.W.3d at 121.

"If the language in an insurance contract is clear and unambiguous, this [c]ourt must construe the contract as written." *Gavan v. Bituminous Cas. Corp.,* 242 S.W.3d 718, 720 (Mo. banc 2008). "The policy 'must be given effect according to the plain terms of the agreement, consonant with the reasonable expectations, objective, and intent of the parties.' " *Wasson,* 358 S.W.3d at 120 (citing *Long,* 351 S.W.3d at 701. "We look to definitions in insurance policies to guide our interpretation, but when words or phrases are not defined in the policy, we look to the plain meaning of words and phrases as it would have been understood by an ordinary person of average understanding when buying the policy." *Id.* (citing *Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687, 690 (Mo. banc 2009)). "While ambiguity exists if the term is 'reasonably open to different constructions,' ... an unreasonable alternative construction will not render the term ambiguous." *Gavan,* 242 S.W.3d at 720 (quoting *Seeck*, 212 S.W.3d at 132). "Courts will not distort the language of an unambiguous insurance policy in order [to] create an ambiguity where none exists." *Wasson*, 358 S.W.3d at 121. "If an insurance policy is unambiguous, we enforce the policy as written." *Long*, 351 S.W.3d at 701. However, if "the policy is ambiguous, ... the ambiguity will be resolved in favor of the coverage for the insured." *Seeck*, 212 S.W.3d at 134.

2

. . . .

> "[T]he existence of UIM coverage and the ability of an insurer to set off stated coverage ' "are determined by the contract entered between the insured and the insurer." ' "
> *Long,* 351 S.W.3d at 702 (quoting *Ritchie v. Allied Prop. & Cas. Ins. Co.,* 307 S.W.3d 132, 135 (Mo. banc 2009) (quoting *Rodriguez v. Gen. Acc. Ins. Co. of Am.,* 808 S.W.2d 379, 383 (Mo. banc 1991))).

***Warden v. Shelter Mut. Ins. Co.***, 480 S.W.3d 403, 405-06 (Mo. App. W.D. 2015).

## Stipulated Facts & Policy Provisions

### JOINT STIPULATION OF FACTS

COME NOW Plaintiff [Owners] and Defendants [Insureds], by and through their undersigned counsel, and stipulate to the following facts for purposes of their Cross-Motions for Summary Judgment:

1. Owners issued [the Policy] to [Insureds.[2]]

2. The Policy was in full force and effect on the relevant dates in question, and provided [UIM] coverage to [Insureds] as the named insured[s] subject to certain provisions, conditions, limitations and exclusions.

3. The Policy's Declarations [("the Declarations")] list the limits of Liability for UIM coverage as $250,000 per person [("the UIM limit")].

4. The Policy contains certain provisions, definitions, references, conditions, statements, limitations and exclusions, the applicability and meaning of which are in dispute, including, among others, the following provisions:

---

[2] A copy of the Policy was referenced in the stipulated facts as being attached and incorporated, but no such copy appears in the legal file immediately following the stipulation. Owners maintains in its brief that a copy of the Policy is included in the legal file following Insureds' suggestions supporting their motion for summary judgment, and Insureds cite the same pages in the legal file as authority for the Policy's terms. As a result, we regard this copy as an accurate copy of the Policy. *Cf.* ***In re Trust of Nitsche***, 46 S.W.3d 682, 684 (Mo. App. S.D. 2001) (a fact that is asserted in one party's brief and conceded in the opponent's brief may be treated as though it were part of the record). The declarations page of the Policy will be further described in our analysis.

3

**Missouri**
**UNDERINSURED MOTORIST COVERAGE**
**Automobile Policy**

It is agreed:

1. **DEFINITIONS**

   The following definitions apply in addition to those contained in **SECTION I – DEFINITIONS** of the policy.

   b.    **Underinsured automobile** means an **automobile** to which a **bodily injury** liability bond or liability insurance policy applies at the time of the **occurrence**:

      (1)    with limits of liability at least equal to or greater than the limits required by the Motor Vehicle Financial Responsibility Law of Missouri; and

      (2)    such limits of liability are less than those stated in the Declarations for [UIM] Coverage.

\* \* \*

2. **COVERAGE**

   a.    **We** will pay compensatory damages, including but not limited to loss of consortium, that any insured is legally entitled to recover from the owner or operator of an **underinsured automobile** for **bodily injury** sustained by an insured person while **occupying** an **automobile** that is covered by **SECTION II – LIABILITY COVERAGE** of the policy.

\* \* \*

4. **LIMIT OF LIABILITY**

   a.    The [UIM limit] stated in the Declarations for [UIM] Coverage [is] for reference purposes only.  Under no circumstances do **we** have a duty to pay **you** or any person entitled to [UIM] Coverage under this policy the entire [UIM limit] stated in the Declarations for this coverage.

4

**b.** Subject to the [UIM limit] stated in the Declarations for [UIM] Coverage and paragraph **4.a.** above, **our** payment for [UIM] Coverage shall not exceed the lowest of:

**(1)** The amount by which the [UIM limit] stated in the Declarations exceed the total limits of all **bodily injury** liability bonds and liability insurance policies available to the owner or operator of the **underinsured automobile**.

**(2)** the amount by which compensatory damages, including but not limited to loss of consortium, because of **bodily injury** exceed the total limits of all **bodily injury** liability bonds and the liability insurance policies available to the owner or operator of the **underinsured** automobile.

. . . .

AUTOMOBILE POLICY DECLARATIONS

\* \* \*

1. 2008 HOND ACCORD EX-L

\* \* \*

| COVERAGES | LIMITS | | PREMIUM CHANGE | |
|---|---|---|---|---|
| Underinsured Motorist | $250,000 person/$500,000 occurrence | 23.00 | 2.85 | - |

\* \* \*

A QUICK GUIDE TO YOUR POLICY

The DECLARATIONS contain:     YOUR NAME

POLICY TERM

YOUR AUTOMOBILES

COVERAGES

LIMITS OF LIABILITY

ENDORSEMENTS THAT APPLY

* * *

INSURING AGREEMENT

The attached Declarations describe the **automobile(s) we** insure and the Coverages and Limits of Liability for which you have paid a premium.

* * *

5. On or about March 1, 2014, Ms. Craig was injured in a car accident when the vehicle she was driving was struck by another vehicle, driven by Tlir Hnin Thang, while Ms. Craig was stopped at a red light.

6. Mr. Thang was insured under a policy of insurance with Shelter Insurance Company ("Shelter"), with a per person bodily injury liability limit of $50,000.

7. Shelter has paid Mr. Thang's $50,000 per person bodily injury limit to [Insureds].

8. The parties agree that the policy and UIM coverage were in full force and effect on the date of the accident, and that [Insureds]' damages exceed $300,000 arising out of the injuries sustained by Ms. Craig. [Insureds] therefore seek UIM coverage in the full amount of the Policy's $250,000 per person UIM limit.

9. On or about July 16, 2014, [Insureds] made demand on Owners for the $250,000 per person UIM limit, which they asserted was the amount to which they were entitled under the Policy's UIM coverage provision.

10. In November 2014, pursuant to agreement among the parties, Owners paid [Insureds] $200,000, representing the $250,000 per person UIM limit with a deduction of the $50,000 payment [Insureds] received from Shelter on behalf of Mr. Thang, and which all parties agree is owed under the terms of the Policy.

11. The parties dispute whether Owners owes [Insureds] an additional $50,000 under the terms of the Policy.

12. [Insureds] paid the premiums for the coverage in dispute.

6

13.    The parties have agreed that the issue of whether the $50,000 in dispute should be paid to [Insureds] under the terms of the Policy may be decided in this declaratory judgment action.

The trial court found the Policy ambiguous in regard to the set-off issue, interpreted the ambiguity in favor of Insureds, and entered summary judgment in their favor.  This appeal timely followed.

**Analysis**

Owners' point maintains that the "[P]olicy clearly and unambiguously provided for a $50,000 deduction from the $250,000 [UIM limit] . . . based on the $50,000" paid by Shelter to Insureds on Mr. Thang's behalf, and the Policy also provided that "'[u]nder no circumstances'" was Owners obligated to pay Insureds "'the entire [UIM limit] stated in the [D]eclarations for [UIM] coverage.'"

In finding the Policy ambiguous regarding the amount of UIM coverage, the trial court stated:  the "Policy does indeed take away in part or whole the unqualified grant of $250,000 UIM coverage found in another portion of the Policy, and, that the material portions are simply not plain, certain, non-suggestive, nor distinct, when viewed through the lens of the average insured purchasing insurance."  (Capitalization adjusted.)

Owners acknowledges "it is well-settled that where one section of an insurance policy promises coverage and another takes it away, the contract is ambiguous." ***Ritchie***, 307 S.W.3d at140-41; ***Jones***, 287 S.W.3d at 692.  Owners' position is that the principle does not apply here because the Policy "never promises to pay the full UIM limit stated in the [D]eclarations" as it:  expressly disclaims liability "for the full UIM [limit] listed in the [D]eclarations"; states that the UIM limit listed in the Declarations "is for reference

7

purposes only"; and provides that the at-fault driver's insurance liability limit will be deducted from the amount paid by Owners.

Insureds add *Manner v. Schiermeier*, 393 S.W.3d 58, 66 (Mo. banc 2013), to the mix, and they point out that in all three of these decisions issued by our high court—*Jones*, *Ritchie*, and *Manner*—the set-off provision at issue was found ambiguous and invalidated. *See also* 307 S.W.3d at 140-41; and 287 S.W.3d at 692-93. Insureds further argue "that *Manner* precludes an offset for UIM coverage" based on our decision in *Beshears v. Shelter Mut. Ins. Co.*, 468 S.W.3d 408, 412 (Mo. App. S.D. 2015). We do not read *Manner* or *Beshears* as broadly.[3]

"[A]lthough other decisions construing set-off provisions and their effect on UIM coverage can be instructive, they are not dispositive in the absence of identical policy language." *Long*, 351 S.W.3d at 702. The whole policy must be evaluated in determining coverage, *Manner*, 393 S.W.3d at 65; *Warden*, 480 S.W.3d at 405, "and any ambiguity will

---

[3] In *Manner*, "[t]he policy promise[d] to pay the listed limits of liability, not simply the listed limits of liability reduced by the amount paid by the tortfeasor[,]" *id*. at 66, and this conflicted with language in the policy's endorsement providing a reduction for the amount paid on account of another's liability such that the ambiguity "must be resolved in favor of coverage up to the amount listed in the limits of liability section" where damages exceeded both types of insurance. *Id.*

In *Beshears*, the limits of liability for UIM coverage were "reduced by the amount paid, or payable, to the **insured** for **damages** by, or for," the at-fault driver. 468 S.W.3d at 410. But the UIM endorsement promised to "pay the **uncompensated damages**, subject to the limit of our liability stated in this coverage[,]" and uncompensated damages was defined as "the portion of the damages that exceeds the total amount paid, or payable, to an **insured** by or on behalf of, all **persons** legally obligated to pay those **damages**[.]" *Id.* The ambiguity was characterized as "inherent" and the explanation of this intrinsic uncertainty was quoted from *Manner*:

> "[I]f the amount recoverable under the insurance policy always is reduced by the amount collected by the tortfeasor, an insured never could recover the entire liability limit set out in the underinsured motorist endorsement because, by definition, an underinsured motorist is someone who paid something toward the insured's damages, although not enough to satisfy those damages nor enough to exceed the insured's underinsured motorist limits."

468 S.W.3d at 412 (quoting 393 S.W.3d at 66 n.8). A policy that expressly states that it does *not* promise to pay the liability limit stated in the Declarations but instead clearly expresses that the dollar amount set forth there is stated only as a part of the calculation used to determine what will be paid by Owners is distinguishable from the inherently ambiguous policy that both promises to cover the full liability limit and also provides that there is no circumstance under which the full liability limit would be paid.

8

be interpreted in favor of the insured[,]" *Manner*, 393 S.W.3d at 63, but an unambiguous "insurance policy must be enforced according to its terms." *Jones*, 287 S.W.3d at 690. An insurance contract may be written in such a way as to reduce the amount paid as damages under UIM coverage by subtracting the at-fault driver's contribution from the UIM limit instead of the total damages suffered. *See, e.g., Warden*, 480 S.W.3d at 408.

Insureds emphasize that the Policy "at multiple places directs [Insureds] to the Declarations page to identify how much coverage they have purchased[,]" the Declarations confirm that the Policy "provides $250,000.00 of UIM Coverage" with the premium being based on this coverage, and "[n]owhere on the Declarations page does it show that there is an offset[.]" Insureds are correct in stating that the Declarations show a chart with "Uninsured Motorist" under the heading "COVERAGES" and "$250,000 person/$500,000 occurrence" under the heading "LIMITS" with no further language detailing the set-off, but the Declarations do list "79339 (7-10)" as one of the "Additional Forms For This Item[,]" and the UIM endorsement included as a part of the Policy is detailed on form 79339 (7-10).

In *Warden*, the western district of this court noted that the significance of a declarations page to the limits of UIM coverage had been removed as an issue due to the language in that particular policy:

> As noted in the text, in this case both the "Introductory Note" to the UIM Endorsement, and the "Insuring Agreement," direct the insured to read the Endorsement's "Limits of **Our** Liability" section. The same was not true in *Wasson*. In that case, the insuring agreement merely stated that the UIM coverage was subject to the coverage's limit of liability, without explicitly directing the insured to the policy section titled "Limits of **Our** Liability." *See* 358 S.W.3d at 122. In that circumstance, *Wasson* held that "the normal place to look for the limits of liability is the declarations page," not the policy section titled "Limits of **Our** Liability." *Id.* at 125. The same issue does not exist in this case, given the very different policy language Shelter now uses.

9

480 S.W.3d at 407 n.2.[4] In other words, the declaration at issue in *Warden* did not override

a UIM liability limitation or render that limitation ambiguous.

In *Simmons v. Farmers Ins. Co.*, 479 S.W.3d 671, 676 (Mo. App. E.D. 2015), the

court stated that "where the declarations page states a coverage amount but does not

adequately alert the Insured to its limitations, we must strictly and carefully consider any

language in the endorsement which might also suggest that the coverage could be considered

excess."[5] *See also Miller v. Ho Kun Yun*, 400 S.W.3d 779, 787 (Mo. App. W.D. 2013);

*Nationwide Ins. Co. of Am. v. Thomas*, 487 S.W.3d 9, 12-13 (Mo. App. E.D. 2016). This

line of cases also acknowledges that a declarations page is generally "less clear" about

coverage characteristics. *Thomas*, 487 S.W.3d at 12; *Simmons*, 479 S.W.3d at 675; *see also*

*Miller*, 400 S.W.3d at 787.

More importantly, our supreme court has held that "[t]he declarations state the

policy's essential terms in an abbreviated form, and when the policy is read as a whole, it is

clear that a reader must look elsewhere to determine the scope of coverage." *Floyd-Tunnell*

*v. Shelter Mut. Ins. Co.*, 439 S.W.3d 215, 221 (Mo. banc 2014). "The 'declarations' are

introductory only and subject to refinement and definition in the body of the policy." *Id.*

(internal quotation and citation omitted).

The Policy language in this case, viewed as a whole, reveals no ambiguity

concerning the UIM limit and the set-off. While the Declarations contained no caveat or

disclaimer regarding UIM coverage, it did not state that it was the sole expression of UIM

---

[4] The *Warden* policy included an "Introductory Note" pointing out that it reduced the total limits payable and then the limitation of liability portion also described how the declaration limit would be reduced by the amount paid by or on behalf of the underinsured tortfeasor. 480 S.W.3d at 406.
[5] The court went on to find that the UIM endorsement was also ambiguous as to the definition of an "underinsured motor vehicle" and upheld summary judgment awarding UIM benefits to Ms. Simmons. *Id.* at 672, 676.

10

coverage, and it referenced other forms, including the UIM endorsement.[6]  That

endorsement plainly stated that "[t]he [UIM limit] stated in the Declarations for [UIM]

Coverage [is] for reference purposes only.  Under no circumstances do **we** have a duty to

pay **you** or any person entitled to [UIM] Coverage under this policy the entire [UIM limit]

stated in the Declarations for this coverage."  It then went on to provide that the *lesser* of

(1) the amount paid on behalf of the operator of the underinsured vehicle subtracted from the

UIM limit; or (2) the amount that the compensatory damages exceeded that paid on behalf of

the operator of the underinsured vehicle would be Owners' payment obligation.

Owners' point is granted, the judgment is reversed, and the matter is remanded for

the entry of a judgment in favor of Owners.


DON E. BURRELL, P.J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – DISSENTS IN SEPARATE OPINION

GARY W. LYNCH, J. – CONCURS

---

[6] We have no quarrel with Insureds' assertion that the Declarations might have been drafted to make the existence of the set-off even clearer, but the legal question before us is whether the language actually used is ambiguous, not whether it might have been better.



OWNERS INSURANCE COMPANY,      )
                               )
    Plaintiff-Appellant,       )
                               )
vs.                            )      No. SD34053
                               )
CHRIS and VICKI CRAIG,         )      Filed: July 19, 2016
                               )
    Defendants-Respondents.    )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Jason Brown, Associate Circuit Judge

**DISSENTING OPINION**

I must respectfully dissent. The trial court read the policy at issue and found it to be

ambiguous. I also find the policy ambiguous. In doing so, I rely on the language and the

holdings of our Supreme Court in ***Manner v. Schiermeier***, 393 S.W.3d 58 (Mo. banc 2013),

***Ritchie v. Allied Property & Cas. Ins. Co.***, 307 S.W.3d 132, 140 (Mo. banc 2009), ***Jones v.***

***Mid-Century Ins. Co.***, 287 S.W.3d 687, 692 (Mo. banc 2009), and our own ***Beshears v.***

***Shelter Mut. Ins. Co.***, 468 S.W.3d 408 (Mo.App. S.D. 2015).

In ***Manner***, the court held:

> As just noted, it is well-settled in Missouri that "courts should not
> interpret policy provision in isolation but rather evaluate policies as a whole."
> *Ritchie*, [307 S.W.3d] at 137. Conflicts and inconsistencies between different
> policy provisions, with one seeming to deny coverage but the other seeming
> to grant it, will render a policy ambiguous, and such an ambiguity will be
> interpreted in favor of the insured. *Id.*

1

. . . .

C. Offset is Not Permitted.

Insurers assert that, because the limits of liability provision in the policies' underinsured motorist endorsement states that underinsured motorist coverage will be reduced by a "payment made or amount payable by or on behalf of any person or organization which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle," the $100,000 that the tortfeasor's insurer paid should offset the amount [Insured] can recover under the underinsured motorist endorsement.

The Court rejects this argument. The policy promises to pay the listed limits of liability, not simply the listed limits of liability reduced by the amount paid by the tortfeasor. Insurers' construction of the policy would permit the policy to promise to pay the full limits of liability and yet these limits never would be paid as the amount of liability promised always would be reduced by the recovery from the other driver.[8] As *Ritchie* noted, this conflict at best creates an ambiguity that must be resolved in favor of coverage up to the amount listed in the limits of liability section if "after deducting the amounts already paid, damages equaling or exceeding those limits are still outstanding." *Ritchie*, 307 S.W.3d at 140.

Here, [Insured's] damages were $1.5 million. Reducing those damages by the $100,000 paid by the tortfeasor leaves a remaining $1.4 million in damages, which far exceeds the $400,000 he can recover under the policies. The full limits of the limits of liability, therefore, are recoverable.[9]

[8]This is because, if the amount recoverable under the insurance policy always is reduced by the amount collected by the tortfeasor, an insured never could recover the entire liability limit set out in the underinsured motorist endorsement because, by definition, an underinsured motorist is someone who paid something toward the insured's damages, although not enough to satisfy those damages nor enough to exceed the insured's underinsured motorist limits.

[9]The insurers also argue that the full amount of any insurance [Insured] recovered by settling his suit against both the manufacturer and seller of the helmet should be deducted. They cite no authority that *underinsured motorist coverage* should be offset by products liability insurance that is not related to vehicles at all, and this Court rejects the suggestion that insureds basically must show that they had no opportunity to sue for tort damages unrelated to underinsured motorist coverage in order to recover on their underinsured motorist coverage. Underinsured motorist coverage, like uninsured motorist coverage, refers to vehicle coverage. In any event, for the reasons just noted, offset would not be permitted.

2

*Manner*, 393 S.W.3d at 65-66 n.8-9.

In *Jones*, our Supreme Court noted in its analysis of an insurance policy:

This Court notes that Mid–Century's interpretation of subsection (f) also would make inaccurate and misleading subsection (b)'s statement that it "will pay up to the limits of liability shown in the schedule below as shown in the Declarations"—that is, that it will pay up to $100,000. This is so because Mid–Century never would be called on to pay its total limit of liability shown on the schedule if it were entitled first to deduct any amounts received from the tortfeasor, for in the case of underinsured motorist coverage, some amount always will have been received from the tortfeasor—that is why the insured is seeking to collect under insured rather than un insured motorist coverage.[2]

> [2]This anomalous result always would occur, for underinsurance coverage never can be invoked unless the insured already has recovered something from the tortfeasor— if the insured had recovered nothing from the tortfeasor, then the insured would be entitled to uninsured motorist coverage of at least the statutory minimum amount—$25,000 in Missouri. Sec. 303.030, RSMo Supp.2004. There will always be an amount, therefore, that must be deducted from the limits of liability of coverage even where those limits are equal to or less than the damages still remaining uncompensated, as is the case here. Were an insured to suffer, for example, $225,000 in total damages, Mid–Century still would be liable only up to $75,000. This is because, under its interpretation of subsection (f), it always would pay only the lesser of the difference between the damages suffered and what the amount already recovered or the liability limit set in the policy, or $100,000, minus at least the amount of minimum coverage of $25,000, and minus even more if the insured had some coverage.

*Jones*, 287 S.W.3d 687, 692 n.2.

In *Beshears*, we noted that the insurers asserted that a provision in the policy's underinsured motorist endorsement states that there will be an offset to the amount listed on the declaration page. We further quoted *Manner* regarding the promise to pay the listed limits of liability. We rejected the policy that permitted a promise to pay the full limits of liability that would never be paid because the amount of liability promised always would be reduced by the recovery from the other driver. We noted if the amount recoverable under

3

the insurance policy always is reduced by the amount collected by the tortfeasor, an insured never could recover the entire liability limit set out in the underinsured motorist endorsement.  *Beshears*, 468 S.W.3d 408, 411-12.  We then quoted *Ritchie*, "this conflict at best creates an ambiguity that must be resolved in favor of coverage up to the amount listed in the limits of liability section if 'after deducting the amounts already paid, damages equaling or exceeding those limits are still outstanding.'"  *Id.* at 412 (quoting *Ritchie*, 307 S.W.3d at 140).

Here, the reasoning of *Manner*, *Ritchie*, *Seeck* and *Beshears*, and the opinion of the trial court demonstrates that the policy was ambiguous.  A company simply cannot promise on the declaration page to provide the consumer with a certain amount of underinsured motorist coverage and then take it away in the fine print of the multi-page insurance policy.  As noted in *Simmons v. Farmers Insurance Company, Inc.*, 479 S.W.3d 671, 677 (Mo.App. E.D. 2015), and *Miller v. Ho Kun Yun*, 400 S.W.3d 779, 791 (Mo.App. W.D. 2013):

> The law is not concerned merely with what an ordinary insured would be caused to believe from reading his existing policy after a bodily injury has occurred. The law is also concerned with what an ordinary purchaser of insurance would be caused to believe about the coverage from review of the policy upon initial receipt of the policy, before an injury has occurred, while there remains time to adjust coverages in light of his or her understanding of the policy contents. See *Burns* [*v. Smith*], 303 S.W.3d [505,] 509 [Mo. banc 2010] (the court applies the meaning which would be attached by "an ordinary person of average understanding if purchasing insurance" (emphasis added)). The auto insurance purchaser, upon receipt of his policy (perhaps in the mail several weeks after purchase) will certainly read the declaration sheet to ensure no miscommunication about coverage levels, even if the purchaser reads little else. Therefore, it is essential that the language of the declaration sheet be part of the analysis in these UIM cases.[9]
>     [9]The courts do not instruct insurers about what to write. One wonders, however, why the insurers would not take a hint from *Ritchie* in their UIM policies so as to cause the declaration page and the endorsement to communicate the concept that the insurer will pay only "the difference

between the amount recovered from the underinsured motorist" (for bodily injury damage) and the sums specified in the declarations. *See Ritchie,* 307 S.W.3d at 141 n. 10.

*Miller*, 400 S.W.3d at 791, n.9.

In this case, the insurance company did not advise the consumer that they will never receive what they purchased. The company offered an amount of coverage as shown on the declaration page and paid an entirely different amount. On that declaration sheet, this consumer chose to pay for $250,000 per person/$500,000 per occurrence in underinsured motorist coverage, not $250,000 minus the $50,000. The carrier will never pay the full amount on the declaration page when the negligent driver is an insured driver because that driver has the statutory amount of liability insurance.[1] Just as the trial judge did, I would find that the trial court did not err in finding the policy as a whole ambiguous. The Craigs, as reasonable consumers, did not get what was promised. The contract was ambiguous.

Further, I certify that the majority opinion is contrary to a previous decision of an appellate court of this State and hereby transfer this case to the Supreme Court of Missouri pursuant to Rule 83.03, Missouri Court Rules (2016).


Nancy Steffen Rahmeyer, J. – Dissenting Opinion Author

---

[1] Although it is not necessary for my analysis of the ambiguity of this contract, I must note that in its own words on its website the company is capable of describing what it is purporting to offer the consumer:

> **Underinsured Motorist:** Protects you and your passengers from losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages.

Auto-Owners Insurance, http://www.auto-owners.com/our-products/car-insurance/resource-center/insurance/determining-coverage (last visited July 1, 2016). The company's underinsured motorist coverage is described as protection for situations where a negligent driver does not have enough insurance to pay for "all losses and damages." In this case, "all losses and damages" exceeded the insurance of the negligent driver. There is no language regarding a set off for the amount of insurance that the negligent driver purchased.