Cody **WARDEN**, Appellant,

v.

**SHELTER MUTUAL INSURANCE COMPANY, Respondent.**

**WD 78252**

Missouri Court of Appeals, Western District.

OPINION FILED: November 17, 2015

MODIFIED: February 02, 2016

---

Mark Kempton, Sedalia, MO, Counsel for Appellant.

William Crawford, Kansas City, MO, Counsel for Respondent.

Before Division Four: Alok Ahuja, Chief Judge Presiding, Thomas H. Newton, Judge, and Charles H. McKenzie, Special Judge

Thomas H. Newton, Judge

Mr. Cody Warden appeals from the trial court's summary judgment in favor of Shelter Mutual Insurance Company allowing Shelter to reduce the Underinsured Motorist (UIM) coverage limit by the amount Mr. Warden received from an underinsured motorist's liability insurer via the set-off language, and prohibiting Mr. Warden from stacking and collecting un-

der three additional Shelter policies providing UIM coverage.

This appeal arises from Mr. Warden's suit to recover UIM benefits for injuries he sustained when he was struck by a car as a pedestrian. Mr. Warden sued Shelter, seeking $400,000.00 in UIM coverage under his four Shelter policies. The parties filed cross-motions for summary judgment, stipulating to the following material facts: (1) Mr. Warden was insured for the purposes of UIM coverages under four Shelter policies, each of which provided UIM coverage of $100,000.00 per person and $300,000.00 per accident; (2) Mr. Warden was struck by an "underinsured motor vehicle" operated by Jesse Anglen; (3) Mr. Warden recovered $25,000.00 from Mr. Anglen's liability insurer, and (4) Mr. Warden demanded that Shelter pay $400,000.00 in UIM coverage available under his four policies. In response, Shelter paid Mr. Warden $75,000.00, equaling the $100,000.00 less the $25,000.00 he recovered from Progressive Insurance, Mr. Anglen's insurer. The trial court ruled that Progressive's $25,000.00 payment reduced (set-off) Shelter's $100,000.00 UIM limit and that the four Shelter policies did not stack. This appeal followed.

Insurance policy interpretations are questions of law that appellate courts review *de novo*. *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007). Where the trial court granted summary judgment, we also apply a *de novo* standard of review. *Long v. Shelter Ins. Companies*, 351 S.W.3d 692, 695–96 (Mo. App. W.D. 2011). "In construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured." *Seeck*, 212 S.W.3d at 132 (Mo. banc 2007). "Language is ambiguous if it is reasonably open to different constructions." *Id.*

## Legal Analysis

"The purpose of underinsured motorist coverage is to provide insurance coverage for insureds who have been bodily injured by a negligent motorist whose own automobile liability insurance coverage is insufficient to pay for the insured person's actual damages." *Wasson v. Shelter Mut. Ins. Co.*, 358 S.W.3d 113, 117 (Mo. App. W.D. 2011). "To determine whether an insurance policy provides coverage, we look to the insurance contract itself." *Long*, 351 S.W.3d at 701. "Courts are not to interpret the provisions of an insurance policy in isolation but rather are to examine the policy as a whole." *Wasson*, 358 S.W.3d at 121.

"If the language in an insurance contract is clear and unambiguous, this [c]ourt must construe the contract as written." *Gavan v. Bituminous Cas. Corp.*, 242 S.W.3d 718, 720 (Mo. banc 2008). "The policy 'must be given effect according to the plain terms of the agreement, consonant with the reasonable expectations, objective, and intent of the parties.'" *Wasson*, 358 S.W.3d at 120 (citing *Long*, 351 S.W.3d at 701). "We look to definitions in insurance policies to guide our interpretation, but when words or phrases are not defined in the policy, we look to the plain meaning of words and phrases as it would have been understood by an ordinary person of average understanding when buying the policy." *Id.* (citing *Jones v. Mid–Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. banc 2009)). "While ambiguity exists if the term is 'reasonably open to different constructions,' ... an unreasonable alternative construction will not render the term ambiguous." *Gavan*, 242 S.W.3d at 720 (quoting *Seeck*, 212 S.W.3d at 132). "Courts will not distort the language of an

unambiguous insurance policy in order [to] create an ambiguity where none exists." *Wasson*, 358 S.W.3d at 121. "If an insurance policy is unambiguous, we enforce the policy as written." *Long*, 351 S.W.3d at 701. However, if "the policy is ambiguous, ... the ambiguity will be resolved in favor of the coverage for the insured." *Seeck*, 212 S.W.3d at 134.

### I. Set–Off Language

■ In his first point, Mr. Warden argues that the trial court erred in finding that the set-off language reduced the UIM coverage limit by the amount Mr. Warden received from Progressive because the set-off language is ambiguous. He contends the language is ambiguous because any ordinary person of average understanding would interpret the UIM endorsement to mean that Shelter will reduce the uncompensated damages payable to an insured by any payment from a liability insurer rather than reduce such a payment from the UIM coverage limit.

"[T]he existence of UIM coverage and the ability of an insurer to set off stated coverage ' "are determined by the contract entered between the insured and the insurer." ' " *Long*, 351 S.W.3d at 702 (quoting *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009) (quoting *Rodriguez v. Gen. Acc. Ins. Co. of Am.*, 808 S.W.2d 379, 383 (Mo. banc 1991))). Thus, we begin our analysis with Shelter's policy language.

INTRODUCTORY NOTE:

This coverage provides a monetary benefit that supplements the amount paid to an **insured** when he or she sustains a covered **bodily injury.** It does not cover **claims** based on **property damage.** *It is important to note that the sections headed: "LIMITS OF OUR LIABILITY" and "INSURANCE WITH OTHER COMPANIES" reduce the total limits provided under this endorsement by the amount paid to an insured by the person(s) who caused the injury, or paid under another insurance policy.* **You** should, therefore, purchase this coverage with a monetary limit in the amount **you** want to ensure is the minimum amount available from *all sources* to compensate an **insured** for his, or her, injuries sustained in an **auto accident.**

INSURING AGREEMENT

If the **owner** or **operator** of an **underinsured motor vehicle** is legally obligated to pay **damages, we** will pay the **uncompensated damages** *subject to all provisions of this policy including those stated below in the subsections headed:* "LIMITS OF **OUR** LIABILITY" and "INSURANCE WITH OTHER COMPANIES".

LIMITS OF **OUR** LIABILITY

The maximum limits of liability for this coverage are stated in the **Declarations** and are subject to the following limitations:

(1) The limit shown for "each person" is the limit of **our** liability for the **claim** of any one **insured.** This limit applies to all **claims** made by others resulting from that **insured's bodily injury,** whether direct or derivative in nature.

(2) The limit shown for "each accident" is subject to the limit for "each person" and is the total limit of **our** liability for the **claims** of two or more **individuals.** This limit applies to all **claims** made by others resulting from those **insured's' bodily injuries,** whether direct or derivative.

(3) The limits stated in the **Declarations** are reduced by the amount paid, or payable, to the **insured** for **damages** by:

(a) All persons who are, or may be, legally liable for the **bodily injury** to that **insured;** and

(b) All liability insurers of those **persons.**

(4) Regardless of the number of:

(a) Vehicles stated in the **Declarations;**

(b) Premiums stated in the **Declarations;**

(c) Vehicles insured by **us;**

(d) Vehicles involved in the **accident;**

(e) **Persons** covered;

(f) **Claims** made; or

(g) Premiums paid;

the limits of liability for this liability for this coverage for two or more **motor vehicles** insured under the same policy, or separate policies, may not be added together, combined, or stacked, to determine the total limit of insurance coverage available to any **insured** for any one **occurrence.**

Mr. Warden relies on *Wasson, supra.* In that case the set-off provisions were deemed ambiguous because the term "uncompensated damages" failed to include language limiting the coverage.[1] Shelter has now highlighted the limitations of coverage in its policy provisions for clarity.[2]

In the Introductory Note at the beginning of the UIM Endorsement, Shelter states: *"It is important to note that the sections headed: 'LIMITS OF OUR LIABILITY' and 'INSURANCE WITH OTHER COMPANIES' reduce the total limits provided under this endorsement by the amount paid to an **insured** by the **person(s)** who caused the injury, or paid under another insurance policy.* Thus, from the outset, the insured is informed that the 'LIMITS OF OUR LIABILITY' and 'INSURANCE WITH OTHER COMPANIES' sections of the policy will reduce the endorsement's total limits by the amount paid under another insurance policy.

Furthermore, continuing to read the endorsement, a reasonable person would notice that the paragraph outlining the insuring agreement is *"subject to all provisions of this policy including those stated below in the sections headed: 'LIMITS OF OUR LIABILITY' and 'INSURANCE WITH OTHER COMPANIES'."* Although the limiting phrase is not included within the definition of uncompensated damages, its application to the payment of uncompensated damages is clearly highlighted for the ordinary reader.

Finally, when the ordinary reader reviews the Limits of Liability section, subsection (3) again informs the reader that

---

1. Shelter's previous policy defined uncompensated damages as follows: "(3) **Uncompensated damages** means the portion of the **damages** that exceeds the total amount paid or payable to an **insured** by, or on behalf of, all persons legally obligated to pay those **damages.**" *Wasson,* 358 S.W.3d at 122. The court of appeals opined that without including a limiting phrase such as "up to our limit of liability" the policy created coverage in excess of what the insured had been paid for his damages. *Id.* at 123.

2. As noted in the text, in this case both the "Introductory Note" to the UIM Endorsement, and the "Insuring Agreement," direct the insured to read the Endorsement's "Limits of **Our** Liability" section. The same was not true in *Wasson.* In that case, the insuring agreement merely stated that the UIM coverage was subject to the coverage's limit of liability, without explicitly directing the insured to the policy section titled "Limits of **Our** Liability." *See* 358 S.W.3d at 122. In that circumstance, *Wasson* held that "the normal place to look for the limits of liability is the declarations page," not the policy section titled "Limits of **Our** Liability." *Id.* at 125. The same issue does not exist in this case, given the very different policy language Shelter now uses.

"[t]he limits stated in the **Declarations** are reduced by the amount paid, or payable, to the **insured** for **damages** by: (a) All persons who are, or may be, legally liable for the **bodily injury** to that **insured;** and (b) All liability insurers of those persons." This provision is similar to the liability provision deemed unambiguous in *Rodriguez v. General Accident Insurance Co. of America*, 808 S.W.2d 379, 382 (Mo. banc 1991). That provision stated, "[t]he limit of liability shall be reduced by all sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible." *Id.* The supreme court ruled that the provision's effect was to set off the amount paid by the legally responsible parties insurance from the UIM coverage provided. *Id.* The court further explained that "the coverage provides a total amount of protection to be paid to the [insured] if other persons legally responsible for [the insured's] injuries have lesser liability limits than those provided under [the insured's] underinsured motorist coverage." *Id.* The same analysis can be applied to the liability provision here. Given the multiple efforts to alert the ordinary reader to the set-off provision and the plain language explanation of its function, we hold that it is neither ambiguous nor misleading. Point one is denied.

## II. Anti–Stacking Provisions

In his second point, Mr. Warden argues that the trial court erred in finding that the anti-stacking language in Shelter's policy prohibited Mr. Warden from stacking and collecting under three additional Shelter policies providing UIM coverage to Mr. Warden.

■ "An anti-stacking clause prohibits the insured from collecting on multiple coverage items or policies from the same insurer for a single accident." *Long*, 351 S.W.3d at 696–97 (quoting *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, [142] (Mo. banc 2009)).[3]

"In determining what coverage is provided for purposes of determining the applicability of underinsured motorist coverage, a court first must determine whether the policy permits coverage from multiple policies to be stacked. If so, then the coverage provided by the policies is their stacked amount, not the amount each would provide if considered separately, and it is the stacked amount that must be compared against the insurance coverage of the tortfeasor." *Manner v. Schiermeier*, 393 S.W.3d 58, 64 (Mo. banc 2013).

Because Missouri has no statutory or public policy requiring UIM coverage be stacked, the courts will not create a requirement for stacked coverage in the absence of ambiguity. *Long*, 351 S.W.3d at 697. "Where an insurance policy promises [its] insured something at one point but then takes it away at another there is an ambiguity." *Id.* at 701.

■ Accordingly, if the UIM endorsements of Mr. Warden's policies permit stacking, he can recover the sum total of the policy limits of the stacked policies, up to the amount of damages remaining after recovery from the tortfeasor. If stacking is not permitted, Mr. Warden's recovery will be limited to the recovery amount of each policy considered singly.

Under Shelter's UIM endorsement, the ordinary reader will see the provision titled "LIMITS OF **OUR** LIABILITY," which reads in relevant part:

The maximum limits of liability for this coverage are stated in the **Declarations** and are subject to the following limitations:

**3.** This quote appears in Chief Justice Price's dissenting opinion.

* * *

(4) Regardless of the number of:

* * *

(c) Vehicles insured by **us**;

(d) vehicles involved in the **accident**;

* * *

(g) Premiums paid;

the limits of liability for this coverage for two or more **motor vehicles** insured under the same policy, or separate policies, may not be added together, combined, or stacked, to determine the total limit of insurance coverage available to any **insured** for any one **occurrence**.

This provision clearly states that stacking the policies is not allowed. The trial court ruled that "[t]his language is clear and unequivocal and is subject to enforcement." We agree.

Mr. Warden argues that the anti-stacking language is ambiguous because the "other insurance with Shelter" general agreement promises stacking of other Shelter policies although the endorsement provides contradictory anti-stacking language. This "general agreement on which insuring agreements are based" states:

> OTHER INSURANCE WITH SHELTER MUTUAL INSURANCE COMPANY OR SHELTER GENERAL INSURANCE COMPANY If more than one policy issued by Shelter Mutual Insurance Company or Shelter General Insurance Company provides coverage for a single loss, this policy covers only the proportion of the total amount payable that its limits bear to the total limits of all such policies. The total maximum amount payable under all such policies is the highest limit of any one coverage applicable to the loss. . . .

Mr. Warden asserts that this provision states that the "policy covers the proportion of the total amount payable that its limits bear to the total limits of all such policies" and that, to avoid stacking, the paragraph should end by stating that the limit of liability is the "highest limit for *any one coverage contained in any one policy.*" Although the suggested language would provide additional clarity to the anti-stacking nature of this provision, the current provision language does not imply that policy stacking is allowed. This provision plainly states in its final sentence that the limit is "the highest limit of any *one* coverage." (emphasis added). This clearly indicates that the coverage limit ends with one policy, not the sum of all polices held by the insured. In addition, even if the policy provision were ambiguous, we are required to examine the insurance policy as a whole instead of viewing each provision in isolation. *Wasson,* 358 S.W.3d at 121.

In the section "General Agreements on Which Insuring Agreements Are Based" an ordinary reader will find the provision titled "EFFECT OF ENDORSEMENTS" which states,

> EFFECT OF ENDORSEMENTS
>
> Endorsements to this policy are a part of it and have the same contractual effect as the provisions of the base policy itself. *If the terms of an endorsement conflict with the terms of the base policy with respect to a specific claim,*[4] *the terms of the endorsement will apply to that claim.* (emphasis added).

■ This section clearly resolves any potential ambiguity created by purported conflicts in an endorsement and the base

---

4. For purposes of this policy, claim is defined as "a request by any person for benefits under a coverage provided by this policy as a result of a single occurrence. It includes lawsuits, requests for the payment of money, request that we take any action, or extend the benefits of any coverage provided by this policy."

policy by stating that the promises within the endorsement reign supreme. This provision revokes any contradictory promises made in the general policy provisions. "An endorsement is designed to amend the form policy 'to suit the needs of the insured or the insurer or to satisfy particular state requirements.'" *Grable v. Atl. Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. App. E.D. 2009) (quoting Donald S. Maleda & Arthur L. Flinter, *Commercial General Liability* 109 (3d. ed. 1990)). "If the language of the endorsement and the general provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement." *Abco Tank & Mfg. Co. v. Fed. Ins. Co.*, 550 S.W.2d 193, 198 (Mo. banc 1977). Consequently, any potential ambiguity between the "LIMITS OF **OUR** LIABILITY" provision in the UIM endorsement and the "Other Insurance with Shelter Mutual Insurance Company or Shelter General Insurance Company" is resolved for the ordinary reader through the "EFFECT OF ENDORSEMENTS" provision.

As explained above, the "LIMITS OF **OUR** LIABILITY" provision is an unambiguous anti-stacking provision. Therefore, the anti-stacking provisions are subject to enforcement. Point two is denied.

### Conclusion

This Court finds no ambiguity in the set-off language or anti-stacking provisions of the Shelter Mutual Insurance Policy issued to Mr. Warden. Therefore, the policy should be enforced as written. The trial court's judgment is affirmed.

Ahuja, C.J., and McKenzie, Sp.J. concur.

