

# Missouri Court of Appeals

## Southern District

### Division Two

JEFFREY D. SWADLEY,  )
CHELSEA S. SWADLEY,  )
and BROOKE L. SWADLEY,  )
 )
 Plaintiffs-Respondents,  )
 )
vs.  )  No. SD34129
 )  Filed: July 19, 2016
SHELTER MUTUAL INSURANCE  )
COMPANY,  )
 )
 Defendant-Appellant.  )

APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable David B. Mouton, Circuit Judge

**REVERSED AND REMANDED WITH DIRECTIONS**

Jeffrey D. Swadley, Chelsea S. Swadley, and Brooke L. Swadley ("the Swadleys"), sued

Shelter Mutual Insurance Company ("Shelter") seeking payment of $100,000 of underinsured

motorist ("UIM") coverage, under the terms of Shelter's insurance policy, for the death of Angela

Swadley[1] that resulted from fatal injuries she sustained in a motor vehicle collision.[2]  The trial

court entered partial summary judgment in favor of the Swadleys, finding Shelter's policy to be

---

[1] Angela Swadley is the deceased spouse of Jeffrey D. Swadley, and the mother of daughters Chelsea D. Swadley and Brooke L. Swadley.

[2] Because a portion of the involved parties share the same surname, for ease of reference, we refer to the parties individually by their first names.  We mean no familiarity or disrespect.

misleading and ambiguous, and awarded the Swadleys $100,000 for UIM coverage.[3]  In one point

on appeal, Shelter contends the trial court erred in entering partial summary judgment in favor of

the Swadleys in that the policy is clear and unambiguous as a whole.  Finding merit to Shelter's

point, the trial court's Judgment is reversed and remanded for further proceedings consistent with

this opinion.

## Factual and Procedural Background

On March 18, 2013, a vehicle driven by Angela was struck by a tractor-trailer unit driven

by Radjapov Sharabidin ("Sharabidin"), an employee of Silk Way Trans, LLC, causing Angela's

vehicle to overturn.  Nathaniel Dillon ("Dillon"), who was driving a motorcycle, struck Angela's

vehicle shortly after the initial collision, lost control of his motorcycle, and then struck Angela

who had exited her vehicle after the initial collision.  Angela died as a result of her injuries.

The Swadleys filed a wrongful death claim against Sharabidin, Silk Way Trans, and Dillon.

The tractor-trailer unit operated by Sharabidin and owned by Silk Way Trans had liability

insurance coverage in the amount of One Million Dollars ($1,000,000).  The Swadleys entered

into a settlement with Sharabidin and Silk Way Trans for the total sum of $823,874.80.[4]

At the time of the accident, Jeffrey, Angela, and Brooke were insured by Shelter Policy

Number 24-1-3735763-4 ("the Policy").  The Policy included an endorsement for UIM coverage.

---

[3] Swadleys' "Second Amended Petition" contained two counts, Count I requested judgment for the UIM coverage and Count II was based on Shelter's vexatious refusal to pay.  Partial summary judgment was granted on Count I.  Count II was dismissed by a "Judgment of Dismissal with Prejudice of Count II of Plaintiffs' Second Amended Petition Only" on May 11, 2016, after the Swadleys filed a "Partial Voluntary Dismissal with Prejudice of Count II of Their Second Amended Petition" on April 28, 2016.  As a result, following entry of the judgment of dismissal on Count II, all matters before the trial court were resolved, rendering the partial summary judgment final for purposes of appeal. Rule 74.01(a).

All rule references are to Missouri Court Rules (2016).

[4] Dillon recovered the balance of the liability policy or $176,125.20.  Dillon was insured at the time of the accident, but the Swadleys did not seek recovery under Dillon's insurance policy.

2

The "Auto Policy Declarations and Policy Schedule" (the "declarations") listed UIM coverage of "$100,000 Per Person $300,000 Per Accident."

The Policy contained certain "DEFINITIONS" which read in relevant part:[5]

(10)  **Declarations** means the part of this policy titled "Auto Policy Declarations and Policy Schedule". It sets out many of the individual facts related to **your** policy including the dates, types, and dollar limit of the various coverages.

. . . .

(51)  **Underinsured motor vehicle** means a **motor vehicle** covered by a liability bond, governmental liability statute, or insurance policy, applicable to the **occurrence**; but the monetary limits of that bond, statutory coverage, or policy, are less than the limits of the underinsured motorists coverage shown in the **Declarations**. The following vehicles and types of vehicles are excluded from the definition of **underinsured motor vehicle**:
(a) The **described auto**;
(b) **Motor vehicles owned** by any **insured**, **spouse**, or a **resident** of any **insured's** household; and
(c) **Motor vehicles** being **used** by any **insured**, the **spouse** of any **insured**, or a **resident** of any **insured's** household, with **general consent**.

Immediately after the "DEFINITIONS" section, the Policy contains a section titled "GENERAL AGREEMENTS ON WHICH INSURING AGREEMENTS ARE BASED," which reads in part:

**YOUR** DUTY TO MAKE SURE **YOUR** COVERAGES ARE CORRECT
**You** agree to check the **Declarations** each time you receive one, to make sure that:
(1)  All the coverages **you** requested are included in this policy; and
(2)  The limit of **our** liability for each of those coverages is the amount **you** requested.
**You** agree to notify **us** within 10 days of the date **you** receive any **Declarations** if **you** believe the coverages, or amounts of coverage, it shows are different from those **you** requested. If **you** do not notify **us** of a discrepancy, **we** will presume the policy meets **your** requirements.

---

[5] Certain words in the Policy appear in **bold** and/or are <u>underscored</u>. Our references to quoted portions of the Policy include the wording as it appears.

3

PREMIUM PAYMENTS
**We** agree to insure **you** based on **your** promise to pay all premiums when due.  If **you** pay the premium when due, this policy provides the insurance coverages in the amounts shown in the **Declarations**. . . .

The  "UNDERINSURED  MOTORIST  ENDORSEMENT,"  Endorsement  numbers A-735.2-A and A-735.3A, contained, in relevant part, the following provisions:

INTRODUCTORY NOTE:
This coverage provides a monetary benefit that supplements the amount paid to an **insured** when he or she sustains a covered **bodily injury**.  It does not cover **claims** based on **property damage**.  It is important to note that the sections headed: "LIMITS  OF  **OUR**  LIABILITY"  and  "INSURANCE  WITH  OTHER COMPANIES" reduce the total limits provided under this endorsement by the amount paid to an **insured** by the **person(s)** who caused the injury, or paid under another insurance policy. **You** should, therefore, purchase this coverage with a monetary limit in the amount **you** want to ensure is the minimum amount available from all sources to compensate an **insured** for his, or her, injuries sustained in an **auto accident**.

INSURING AGREEMENT:
If the **owner** or **operator** of an **underinsured motor vehicle** is legally obligated to pay **damages**, **we** will pay the **uncompensated damages** subject to all provisions of this policy including those limits stated below in the sections headed:  "LIMITS OF **OUR** LIABILITY" and "INSURANCE WITH OTHER COMPANIES".

. . . .

LIMITS OF **OUR** LIABILITY
The maximum limits of liability for this coverage are stated in the **Declarations** and are subject to the following limitations:

. . . .
(3)    The limits stated in the **Declarations** are reduced by the amount paid, or payable, to the **insured** for **damages** by:
   (a)    All **persons** who are, or may be, legally liable for the **bodily injury** to that **insured**; and
   (b)    All liability insurers of those **persons**.

On January 3, 2014, the Swadleys made a claim for the UIM coverage under the Policy. Shelter denied the claim, arguing that the motor vehicle operated by Sharabidin was not an underinsured motor vehicle because Sharabidin and Silk Way Trans had an insurance policy with monetary limits greater than the limits of the UIM coverage shown in the Policy declarations.

4

On May 27, 2014, the Swadleys filed a "Petition for Damages" against Shelter. In Count I of their Second Amended Petition for Damages filed on July 31, 2014, the Swadleys alleged they were entitled to the available limit of UIM coverage of "$100,000/$300,000" for damages suffered by Angela due to the negligence of Sharabidin and Silk Way Trans.

On March 4, 2015, Shelter filed its "Motion for Summary Judgment" asserting the motor vehicle operated by Sharabidin was not an UIM vehicle as defined by the Policy as the motor vehicle operated by Sharabidin had an insurance policy with monetary limits greater than the limits of the UIM coverage shown in the Policy declarations.

On April 3, 2015, the Swadleys filed a "Cross-Motion for Partial Summary Judgment" on Count I of their Second Amended Petition asserting the Policy was ambiguous as a whole as to the UIM coverage in that the declarations and other portions of the Policy promised the insured UIM coverage "of up to $100,000 per person," but in other portions of the Policy, including the definitions, it limited the promised coverage.

On June 15, 2015, the trial court heard argument on both motions and took the matter under advisement. On June 19, 2015, the trial court entered its "Order" granting the Swadleys' motion for partial summary judgment on Count I, and denying Shelter's motion for summary judgment, finding that the Policy was "misleading and ambiguous" without specific explanation.

On August 17, 2015, the parties entered into a "Joint Stipulation." Shelter stipulated that the Swadleys sustained at least $923,874.80 in damages as a result of the wrongful death of Angela. Thus, the sole question with regard to the Swadleys' UIM claim was whether UIM coverage was available to the Swadleys under the Policy.

The trial court then entered its "Judgment" on August 17, 2015. The Judgment granted the Swadleys' partial motion for summary judgment on Count I of their Second Amended Petition for

the UIM claim, and denied Shelter's motion for summary judgment. The trial court ordered Shelter to pay to the Swadleys the disputed UIM coverage of $100,000, pursuant to the stipulated fact that the Swadleys had sustained at least $923,874.80 in damages as the result of the wrongful death of Angela. This appeal followed.

In its sole point on appeal, Shelter asserts the trial court erred in declaring that the UIM coverage was available under the Policy because the Policy as a whole was not misleading or ambiguous.

The question for our review is whether the trial court erred in awarding UIM coverage on the basis that the Policy was ambiguous.

### Standard of Review

Our review of a trial court's grant of summary judgment is essentially *de novo*, and we view the record in the light most favorable to the party against whom judgment was entered. ***ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.***, 854 S.W.2d 371, 376 (Mo. banc 1993).

Once the movant has made "a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law," the burden shifts to the non-movant to show that one or more of the material facts shown by movant not to be in dispute, is actually genuinely disputed. ***Id.*** "The non-movant may not rest upon the allegations and denials of the pleadings, but rather must use affidavits, depositions, answers to interrogatories, or admissions on file to show the existence of a genuine issue for trial." ***Crow v. Crawford & Co.***, 259 S.W.3d 104, 113 (Mo.App. E.D. 2008). "A genuine dispute is one that is real, not merely argumentative, frivolous, or imaginary." ***Id.***

6

"The key to summary judgment is the undisputed right to judgment as a matter of law; not simply the absence of a fact question." ***ITT Commercial Finance Corp.***, 854 S.W.2d at 380. Summary judgment must still be denied if all of the uncontroverted "factual assertions are not sufficient to entitle the movant to judgment as a matter of law." ***Jordan v. Peet***, 409 S.W.3d 553, 558 (Mo.App. W.D. 2013). "Summary judgment should not be granted unless evidence could not support any reasonable inference for the non-movant[]" by which the non-movant could state, as applicable, a claim or defense. ***Grissom v. First Nat'l. Ins. Agency***, 364 S.W.3d 728, 735 (Mo.App. S.D. 2012) (internal quotation and citation omitted).

The parties agree there are no material disputed facts before us.

Our review of the construction of an insurance policy is *de novo*. ***Rice v. Shelter Mut. Ins. Co.***, 301 S.W.3d 43, 46 (Mo. banc 2009).

**Analysis**

Shelter argues the trial court erred in finding that UIM coverage was available under the Policy because Sharabidin was not an underinsured motorist under the terms of the Policy[6] and because the Policy was not ambiguous.

The Swadleys, however, argued to the trial court that the declarations page specifies $100,000 in UIM coverage, but other policy language takes the $100,000 coverage away because the policy language repeatedly refers back to the declarations page showing $100,000 without limitation there. For that reason, the Swadleys argue, the Policy was misleading and ambiguous in that there was duplicity, indistinctness, or uncertainty in the Policy. *See **Seeck v. Geico General***

---

[6] Our analysis does not stop with the Policy definition of UIM coverage, and we must instead look to the entire policy to determine whether there is an ambiguity. *See **Seeck v. Geico General Ins. Co.***, 212 S.W.3d 129, 132-34 (Mo. banc 2007), and ***Manner v. Schiermeier***, 393 S.W.3d 58, 62-65 (Mo. banc 2013). The parties agree this analysis is appropriate.

7

*Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007). The Swadleys' burden is to show that an ordinary person of average understanding would be misled when reading the Policy. *Rice*, 301 S.W.3d at 47.

The Swadleys' argument begins with the UIM coverage limits shown on the declarations page. We observe that the declarations page is not a complete description of the coverage in an insurance policy. Specifically, our supreme court has held that "[t]he declarations state the policy's essential terms in an abbreviated form, and when the policy is read as a whole, it is clear that a reader must look elsewhere to determine the scope of coverage." *Floyd-Tunnell v. Shelter Mut. Ins. Co.*, 439 S.W.3d 215, 221 (Mo. banc 2014). More specifically, "[t]he 'declarations' are introductory only and subject to refinement and definition in the body of the policy." *Id.* (internal quotation and citation omitted).

In fact, the Swadleys confirm in their brief the propriety of limitations to coverages in an insurance contract:

> Missouri law clearly does not prohibit an insurance contract from setting forth the maximum amount the insurer will pay in one part, and then stipulating the circumstances under which the insurer may lower the maximum amount it will pay, **so long as all considered sections contain plain and unambiguous terms, and reading them together does not create an ambiguity**. . . . Missouri law recognizes that definitions, exclusions, conditions, and endorsements are necessary provisions in insurance policies, and [the Swadleys] do not argue to the contrary.

(internal quotation and citations omitted) (bold in original).

The Swadleys are unable to point to specific language within the Policy that purports to create ambiguity, or grants coverage in one section and takes that coverage away in another section, outside of the declarations page. They contend that the UIM endorsement is ambiguous, and that similar language in other endorsements have been held to be ambiguous.

8

Our Western District recently examined a similar Shelter endorsement, with policy language in large part identical to the issue here, in ***Warden v. Shelter Mutual Insurance Company***, 480 S.W.3d 403 (Mo.App. W.D. 2015), and we quote directly from that decision:

> In the Introductory Note at the beginning of the UIM Endorsement, Shelter states: "*It is important to note that the sections headed: 'LIMITS OF **OUR** LIABILITY' and 'INSURANCE WITH OTHER COMPANIES' reduce the total limits provided under this endorsement by the amount paid to an **insured** by the **person(s)** who caused the injury, or paid under another insurance policy.* Thus, from the outset, the insured is informed that the 'LIMITS OF [**OUR]** LIABILITY' and 'INSURANCE WITH OTHER COMPANIES' sections of the policy will reduce the endorsement's total limits by the amount paid under another insurance policy.
>
> Furthermore, continuing to read the endorsement, a reasonable person would notice that the paragraph outlining the insuring agreement is "*subject to all provisions of this policy including those stated below in the sections headed: 'LIMITS OF **OUR** LIABILITY' and 'INSURANCE WITH OTHER COMPANIES'*." Although the limiting phrase is not included within the definition of uncompensated damages, its application to the payment of uncompensated damages is clearly highlighted for the ordinary reader.
>
> Finally, when the ordinary reader reviews the Limits of Liability section, subsection (3) again informs the reader that "[t]he limits stated in the **Declarations** are reduced by the amount paid, or payable, to the **insured** for **damages** by: (a) All persons who are, or may be, legally liable for the **bodily injury** to that **insured**; and (b) All liability insurers of those persons." This provision is similar to the liability provision deemed unambiguous in *Rodriguez v. General Accident Insurance Co. of America*, 808 S.W.2d 379, 382 (Mo. banc 1991). That provision stated, "[t]he limit of liability shall be reduced by all sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible." *Id.* The supreme court ruled that the provision's effect was to set off the amount paid by the legally responsible parties [sic] insurance from the UIM coverage provided. *Id.* The court further explained that "the coverage provides a total amount of protection to be paid to the [insured] if other persons legally responsible for [the insured's] injuries have lesser liability limits than those provided under [the insured's] underinsured motorist coverage." *Id.* The same analysis can be applied to the liability provision here. Given the multiple efforts to alert the ordinary reader to the set-off provision and the plain language explanation of its function, we hold that it is neither ambiguous nor misleading.

***Warden***, 480 S.W.3d at 407-08. (Emphasis in original).

We find the language and reasoning in *Warden* persuasive. We need not repeat it further in view of the record before us. The UIM endorsement is not misleading and ambiguous.[7] An ordinary person of average understanding would be alerted to, and not misled as to the limitations for the UIM coverage. The trial court erred in concluding that the Policy was misleading and ambiguous so that $100,000 of UIM coverage was available to the Swadleys on that basis. Shelter's point is well taken. We reverse and remand to the trial court for further proceedings consistent with this opinion.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. – DISSENTS IN SEPARATE OPINION

GARY W. LYNCH, J. – CONCURS

---

[7] We observe that the dissent fails to identify any specific policy language in the insuring agreement that would create an ambiguity. Specific policy language is identified in supreme court decisions cited on page two of the dissent.



# Missouri Court of Appeals

## Southern District

### Division Two

JEFFREY D. SWADLEY,          )
CHELSEA S. SWADLEY,          )
and BROOKE L. SWADLEY,       )
                             )
        Plaintiffs-Respondents, )
                             )
vs.                          )      No. SD34129
                             )      **Filed:** July 19, 2016
SHELTER MUTUAL INSURANCE     )
COMPANY,                     )
                             )
        Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

Honorable David B. Mouton, Circuit Judge

**DISSENTING OPINION**

I must respectfully dissent. In this case we have an insurance policy for underinsured motorist coverage. The trial court read the policy at issue and found it to be ambiguous. The majority opinion relies upon a decision of the Western District of this Court, where the decision of a different trial judge was affirmed in a similar policy. In *Warden v. Shelter Mutual Insurance Company*, 480 S.W.3d 403 (Mo.App. W.D. 2015), the appellate court decided that "a reasonable person would notice [a particular] paragraph[.]" There was a declaration page setting forth the amount of coverage, just as in this policy, and the purported set-off and definitions as in this case. I believe the Western District failed to follow the mandates of our Supreme Court in

*Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007), *Manner v.*

*Schiermeier*, 393 S.W.3d 58 (Mo. banc 2013), *Ritchie v. Allied Property & Cas. Ins. Co.*, 307

S.W.3d 132, 140 (Mo. banc 2009), *Jones v. Mid-Century Ins. Co.*, 287 S.W.3d 687, 692 (Mo.

banc 2009), the Eastern District in *Simmons v. Farmers Insurance Company, Inc.*, 479 S.W.3d

671 (Mo.App. E.D. 2015), and our own precedent in *Beshears v. Shelter Mut. Ins. Co.*, 468

S.W.3d 408 (Mo.App. S.D. 2015).

In *Manner*, the court held:

> As just noted, it is well-settled in Missouri that "courts should not interpret policy provision in isolation but rather evaluate policies as a whole." *Ritchie*, [307 S.W.3d] at 137. Conflicts and inconsistencies between different policy provisions, with one seeming to deny coverage but the other seeming to grant it, will render a policy ambiguous, and such an ambiguity will be interpreted in favor of the insured. *Id.*
>
> . . . .
>
> C. Offset is Not Permitted.
> Insurers assert that, because the limits of liability provision in the policies' underinsured motorist endorsement states that underinsured motorist coverage will be reduced by a "payment made or amount payable by or on behalf of any person or organization which may be legally liable, or under any collectible auto liability insurance, for loss caused by an accident with an underinsured motor vehicle," the $100,000 that the tortfeasor's insurer paid should offset the amount [Insured] can recover under the underinsured motorist endorsement.
> The Court rejects this argument. The policy promises to pay the listed limits of liability, not simply the listed limits of liability reduced by the amount paid by the tortfeasor. Insurers' construction of the policy would permit the policy to promise to pay the full limits of liability and yet these limits never would be paid as the amount of liability promised always would be reduced by the recovery from the other driver.[8] As *Ritchie* noted, this conflict at best creates an ambiguity that must be resolved in favor of coverage up to the amount listed in the limits of liability section if "after deducting the amounts already paid, damages equaling or exceeding those limits are still outstanding." *Ritchie*, 307 S.W.3d at 140.
> Here, [Insured's] damages were $1.5 million. Reducing those damages by the $100,000 paid by the tortfeasor leaves a remaining $1.4 million in damages, which far exceeds the $400,000 he can recover under the policies. The full limits of the limits of liability, therefore, are recoverable.[9]
> > [8]This is because, if the amount recoverable under the insurance policy always is reduced by the amount collected by the tortfeasor, an insured never could recover the entire liability limit

set out in the underinsured motorist endorsement because, by definition, an underinsured motorist is someone who paid something toward the insured's damages, although not enough to satisfy those damages nor enough to exceed the insured's underinsured motorist limits.

[9]The insurers also argue that the full amount of any insurance [Insured] recovered by settling his suit against both the manufacturer and seller of the helmet should be deducted. They cite no authority that *underinsured motorist coverage* should be offset by products liability insurance that is not related to vehicles at all, and this Court rejects the suggestion that insureds basically must show that they had no opportunity to sue for tort damages unrelated to underinsured motorist coverage in order to recover on their underinsured motorist coverage. Underinsured motorist coverage, like uninsured motorist coverage, refers to vehicle coverage. In any event, for the reasons just noted, offset would not be permitted.

*Manner*, 393 S.W.3d at 65-66 n.8-9.

In *Jones*, our Supreme Court noted in its analysis of an insurance policy:

This Court notes that Mid–Century's interpretation of subsection (f) also would make inaccurate and misleading subsection (b)'s statement that it "will pay up to the limits of liability shown in the schedule below as shown in the Declarations"— that is, that it will pay up to $100,000. This is so because Mid–Century never would be called on to pay its total limit of liability shown on the schedule if it were entitled first to deduct any amounts received from the tortfeasor, for in the case of underinsured motorist coverage, some amount always will have been received from the tortfeasor—that is why the insured is seeking to collect under insured rather than un insured motorist coverage.[2]

[2]This anomalous result always would occur, for underinsurance coverage never can be invoked unless the insured already has recovered something from the tortfeasor—if the insured had recovered nothing from the tortfeasor, then the insured would be entitled to uninsured motorist coverage of at least the statutory minimum amount—$25,000 in Missouri. Sec. 303.030, RSMo Supp.2004. There will always be an amount, therefore, that must be deducted from the limits of liability of coverage even where those limits are equal to or less than the damages still remaining uncompensated, as is the case here. Were an insured to suffer, for example, $225,000 in total damages, Mid–Century still would be liable only up to $75,000. This is because, under its interpretation of subsection (f), it always would pay only the lesser of the difference between the damages suffered and what the amount already recovered or the liability limit set in the policy, or $100,000, minus

at least the amount of minimum coverage of $25,000, and minus even more if the insured had some coverage.

*Jones*, 287 S.W.3d 687, 692 n.2.

The reasoning set forth in *Simmons v. Farmers Insurance Company, Inc.*, 479 S.W.3d 671 (Mo.App. E.D. 2015), is illustrative. In *Simmons*, the insurer claimed that limits of liability for the person causing the injury were equal to the amount of the insureds policy and therefore there was no coverage at all by its plain terms. *Id.* at 673. The Eastern District of this Court held that "[a]n ambiguity exists if the language used is reasonably open to different interpretations or where there is duplicity, indistinctiveness, or uncertainty in meaning." *Id.* "Similarly, a contract that promises something at one point and takes it away at another is ambiguous." *Id.* at 674. Noting the *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007) analysis, the court stated that when a "policy ostensibly provided $100,000 of underinsured motorist coverage, the insurer would never have to pay that amount if it was allowed to set off the payment from the tortfeasor, thus creating an ambiguity, which was required to be resolved in the Insured's favor." *Id.*

Likewise in this contract, the consumer purchased what appeared to be $100,000 per person/$300,000 per accident in underinsured coverage. That amount was on a declaration sheet. There are no disclaimers on the declaration page or referrals to other pages, to explain that, in fact, the company would never pay that amount. The declaration page read in conjunction with the policy as a whole creates the ambiguity. A reading of the declaration page does not assist the consumer in understanding that the declaration amount is incorrect. Rather, the policy contained the definitions set forth in the majority opinion as paragraph 51 of the general definitions in a twenty-nine page policy.

4

In case after case, trial courts and appellate courts try to parse the language of an insurance policy such as this and give lip service to what "a reasonable person" would and would not understand in the policy. We pretend that a reasonable person who buys insurance actually reads a twenty-nine page policy issued to them at the same time the check for insurance is signed and the subsequent endorsements that are presented from time to time.[1] To determine if there is coverage under the policy, our courts rely upon contract principles in analyzing the remainder of the contract and ignore the declaration page – the one document consumers are likely to read.

As noted in *Miller v. Ho Kun Yun*, 400 S.W.3d 779, 791 (Mo.App. W.D. 2013):

> The law is also concerned with what an ordinary purchaser of insurance would be caused to believe about the coverage from review of the policy upon initial receipt of the policy, *before* an injury has occurred, while there remains time to adjust coverages in light of his or her understanding of the policy contents. . . . The auto insurance purchaser, upon receipt of his policy (perhaps in the mail several weeks after purchase) will certainly read the declaration sheet to ensure no miscommunication about coverage levels, even if the purchaser reads little else.

*See also* **Simmons**, 479 S.W.3d at 677 (quoting *Miller*).

None of these contracts are written for the reasonable consumer to read or understand. It is time to say so. An educated trial judge and educated appellate courts must search not only the declarations page to find out the amount of coverage, but also discern what "a **motor vehicle** covered by a liability bond, governmental liability statute, or insurance policy, applicable to the **occurrence**; but . . . less than the limits of the underinsured motorists coverage shown in the **Declarations**" means and, finally, then review the general agreements to arrive at another paragraph in determining whether or not the consumer actually receives the coverage that is

---

[1] In actuality, in this day, many policies are obtained without a personal presence at an insurance agent's office. The consumer takes the multi-page contract in total and usually after paying the premium.

written on the declaration page. Appellate judges are then forced to rely on language of endorsements that use paragraphs like this to reduce coverage:

> This coverage provides a monetary benefit that supplements the amount paid to an **insured** when he or she sustains a covered **bodily injury**. . . . It is important to note that the sections headed: "LIMITS OF **OUR** LIABAILITY" and "INSURANCE WITH OTHER COMPANIES" reduce the total limits provided under this endorsement by the amount paid to an **insured** by the **person(s)** who caused the injury, or paid under another insurance policy. **You** should, therefore, purchase this coverage with a monetary limit in the amount **you** want to ensure is the minimum amount available from all sources to compensate an **insured** for his, or her, injuries sustained in an **auto accident**.

After reading that paragraph, I have to ask, what does "all sources" mean? Does it mean a consumer must borrow money to pay for his or her injuries and that amount is considered a "source" and is, thus, eligible as a deduction from the amount listed in the declaration page? Is that the next claim by the makers of these contracts set forth in almost all contracts for insurance?

The results of the limitations are that an insurance company never has to pay the full amount listed on the declarations page. In **Beshears**, this Court quoted **Manner** regarding the promise to pay the listed limits of liability. We rejected the policy that permitted a promise to pay the full limits of liability that would never be paid because the amount of liability promised always would be reduced by the recovery from the other driver. We noted if the amount recoverable under the insurance policy always is reduced by the amount collected by the tortfeasor, an insured never could recover the entire liability limit set out in the underinsured motorist endorsement. **Beshears**, 468 S.W.3d 408, 411-12.[2] We then quoted **Ritchie**, "this conflict at best creates an ambiguity that must be resolved in favor of coverage up to the amount

---

[2] If the insured is injured by an insured motorist, the insurance company always deducts the amount of insurance someone else purchased from the amount of the insured's policy. If the insured is injured by an uninsured motorist then the premium paid for uninsured motorist coverage is available.

listed in the limits of liability section if 'after deducting the amounts already paid, damages equaling or exceeding those limits are still outstanding.'" *Id.* at 412 (quoting **Ritchie**, 307 S.W.3d at 140).

Here, the Swadleys purchased $100,000 per person insurance to compensate themselves for their injuries obtained in an automobile accident and received $75,000 in compensation from their own insurance company. The Swadleys are not alone. Almost all insurance companies provide less coverage than the declaration page for underinsured coverage.[3] The insurance company should not force consumers into a lawsuit to recover what the consumer paid for. The insurers should simply sell an amount of under-insurance that the company is actually going to pay in every case with no limitations, disclaimers and search through the policy.

For that reason, I must dissent and find the policy, written as a whole, ambiguous, just as the trial judge did. Further, I certify that the majority opinion is contrary to a previous decision of an appellate court of this State and hereby transfer this case to the Supreme Court of Missouri pursuant to Rule 83.03, Missouri Court Rules (2016).

Nancy Steffen Rahmeyer, J. - Dissenting Opinion Author

---

[3] Although it is not dispositive in my analysis of this contract and is not in the record, I have to note that even insurance companies seem to be under the reasonable person expectation when they provide information to consumers. As found on this insurance company's website:

> **Uninsured/Underinsured Motorist – Bodily Injury**
> Being injured in an accident is bad enough, but imagine how much worse it would be if you found out the other driver is uninsured or underinsured. Uninsured/underinsured motorist bodily injury coverage can help pay medical or funeral expenses for you, most relatives living in your household, or anyone driving your car with your permission. Uninsured motorist coverage may apply if:
> The other driver was at fault and did not have current insurance, or
> The other driver's available insurance limits are less than the **full amount** owed for your damages.

Shelter Insurance, https://www.shelterinsurance.com/insurance/autoinsurance/carinsurance/coverageoptions/ (last visited July 1, 2016) (emphasis added). The company explains underinsured motorist coverage to be available when the other driver's available insurance limits are less than the **full amount** owed for damages. There is nothing in their own information stating "there will be set offs in every case for the insurance that someone else purchased."